Sylvia A. TREVINO and Oscar Trevino, Individually and as Next Friends of Oscar J. Trevino, Neil Lee Trevino, and Stephanie Ann Trevino, Minor Children, Appellants,

v.

KENT COUNTY, Texas, d/b/a Kent County Nursing Home, Appellee.

No. 07–96–0017–CV.

Court of Appeals of Texas, Amarillo.

Dec. 30, 1996.

Rehearing Overruled Jan. 29, 1997.

Castro & Davis, Isaac M. Castro, Jeffrey S. Davis, Hamlin, for appellants.

Law Offices of Timothy D. Yeats, Timothy D. Yeats, Big Spring, for appellee.

Before BOYD, C.J., and QUINN and REAVIS, JJ.

QUINN, Justice.

Sylvia A. and Oscar Trevino, individually and as next friends of Oscar J. Trevino, Neil Lee Trevino, and Stephanie Ann Trevino (the Trevinos) appealed from a final judgment denying them all recovery against Kent County, Texas, d/b/a Kent County Nursing Home (Kent County). Seven points of error were assigned as basis for reversal. Through the first four, the Trevinos asked whether the court erred in 1) denying their motions for directed verdict or for judgment notwithstanding verdict, 2) submitting the cause to the jury, and 3) denying them damages. In the last three, they asked whether the evidence was factually insufficient to support the verdict and resulting judgment. We answer no to each question and affirm.

### Points of Error One, Two, Three, and Four

Points one and two involve the trial court's refusal to grant the Trevinos a directed verdict or to enter a judgment notwithstanding verdict. Specifically, they believed that they proved, "as a matter of law" 1) that Sylvia Trevino sustained an injury during the course and scope of her employment as housekeeper at the Kent County Nursing Home, 2) that having occurred during the course of employment, the injury was compensable, 3) that Sylvia was terminated from her job as housekeeper because she filed a worker's compensation claim in good faith, and 4) that she was damaged as a result of her wrongful termination. Point three involved the allegation that the court erred in submitting the case to the jury since Kent County raised no evidence creating material issues of fact. And, point four encompasses

the allegation that Sylvia Trevino should have been awarded damages and attorney's fees due to her wrongful termination. We overrule each.

### a. Background

The record revealed that the court submitted three issues to the jury. The first asked the jurors to determine whether Sylvia "receive[d] an injury on or about May 11, 1994, in the course of her employment with" Kent County. The second wanted them to decide whether Kent County "discharged or in any other manner discriminated against ... [her] because ... [she] filed a workers' compensation claim in good faith." The third and final issue involved the amount of damages, if any, which she would be entitled, assuming either or both questions one or two were answered in the affirmative. In response to issues one and two, the jury replied "No." Given that, it never answered question three.

### b. Standard of Review

As urged by the Trevinos, and when the appellant endeavors to overcome an adverse fact finding "as a matter of law," we may reverse only if we determine that no evidence exists which supports the jury's finding and that the converse of that finding was established as a matter of law. *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989). Yet, with this principle go several others of equal import.

For instance, one cannot forget that the testimony of an interested witness, such as a party, simply raises fact issues which the jury must decide. *Estate of Morris*, 577 S.W.2d 748, 753 (Tex.Civ.App.—Amarillo 1979, writ ref'd n.r.e.); *Prince v. North State Bank*, 484 S.W.2d 405, 409–10 (Tex.Civ.App.—Amarillo 1972, writ ref'd n.r.e.); *Mackey v. Gulf Ins. Co.*, 443 S.W.2d 911, 913 (Tex.Civ.App.—Amarillo 1969, no writ). And, because of this, the trial court is generally precluded from entering a directed verdict, or judgment notwithstanding verdict, upon such testimony. *Washington v. Reliable Life Ins. Co.*, 581 S.W.2d 153, 158–59 (Tex.1979): *Collora v. Navarro*, 574 S.W.2d 65, 69 (Tex.1978); *see CPS Int'l, Inc. v. Harris & Westmoreland*, 784 S.W.2d 538, 542 (Tex.App.—Texarkana 1990, no writ) (extending the rule to motions for judgment notwithstanding verdict). Yet, this is not so if the testimony imparted by the interested witness is "clear, direct, ... positive, ... free from internal inconsistencies or contradictions, ... uncontradicted by other testimony or circumstances" and free of indicia which would render it reasonably suspect. *Washington v. Reliable Life Ins. Co.*, 581 S.W.2d at 159, *quoting Collora v. Navarro, supra.* If the latter circumstance arises, then the trial court may base a directed verdict upon the testimony. We now turn to applying these rules to the case at hand.

### c. Discussion

#### 1. That the Injury Occurred During the Course of Employment

As the initial witness, Sylvia stated that while working as a housekeeper at the Kent County Nursing Home on May 11, 1994, she attempted to place a water bottle atop a drinking fountain. In lifting the object, without the help of others, from the floor to a nearby table she allegedly heard and felt her back "pop." When asked at trial if she experienced any pain, her reply ventured from "[w]ell, at that time it just popped and that's about it" to "some pain at the time." However, several months earlier, that is, in April of 1995, she apparently told her doctor that she "had *immediate* onset of back pain at that time *with radiation to the hip*" for that was what he wrote in his report. (Emphasis added). She further testified that despite experiencing the "pop," she removed the bottle from the table and affixed it to the fountain, again without the help of anyone.

Next, she stated that Vicki Kyle, her supervisor, not only witnessed the transaction but also received report of the injury from the allegedly injured employee. In response, Vicki directed her to inform Kathy Lisenbee, the administrator of the home. The two then supposedly went to Kathy's office where Sylvia repeated her version of the event. Upon hearing the report, Kathy allegedly "laughed and ... told ... [Sylvia] '[t]here goes another one [and][g]o back to work.' "

Thereafter, Sylvia returned to her chores and worked until May 17th. On the latter date, the pain allegedly became unbearable. So, her husband picked her up from work and took her to a doctor. Sylvia told Kathy of her visit with the doctor on the next day, and Kathy allegedly "dismissed" her.

Of course, Kathy's testimony differed. First, she denied terminating Sylvia's employment; instead, Ms. Trevino was supposedly placed on a medical leave of absence. Attempt to corroborate this was made by stating that the employee was never taken "off of ... [the] books." So too was it said that once Ms. Trevino returned with a "100%" release from her doctor, effort would be made to reinstate her.

Kathy also denied being told of the purported injury on May 11th. Instead, Sylvia allegedly revealed the incident to her seven days later, on the 18th. Furthermore, Kathy recalled that Sylvia originally claimed the incident occurred on May 12, as opposed to May 11. The witness further denied making the cavalier and insensitive comments attributed to her by Sylvia. Rather, Kathy was allegedly concerned with the belatedness of the report since the home had a policy requiring that work-related injuries be reported within eight hours of occurrence.

So too did Kathy state 1) that the first report she received from Sylvia indicated that the injury happened while the bottle was being placed on the drinking urn itself, as opposed to the table, 2) that Sylvia did not act alone but that Vicki and a Marta Duenes assisted her in replenishing the fountain, 3) that Ms. Trevino never complained of back or hip pain between May 11th and May 18th, 4) that the purpose of the May 17th doctor's visit was to let the physician examine "a lump on her hip," 5) that Sylvia had difficulty working under the supervision of Vicki, and 6) that shortly before May 11th Sylvia was given the option to obey Vicki or find employment elsewhere.

Marta Duenes also appeared at trial and testified. And like those of Kathy, her comments tended to contradict Sylvia's. For instance, she proffered 1) that she saw Vicki help Sylvia lift the bottle, 2) that she too assisted Sylvia and Vicki in the task, 3) that all three were laughing and giggling at the time, 4) that she never heard a "popping sound," 5) that she never heard Sylvia complain of any injury, 6) that she never saw Sylvia limp or act in an unordinary manner or in a manner suggesting any injury, and 7) that Sylvia appeared to be "okay" between May 11th and the 18th.

To compare the foregoing testimony is to conclude that little was clear or uncontradicted regarding the circumstances surrounding the supposed injury. For instance, while Sylvia said she acted alone when lifting the bottle, Marta said that she and Vicki helped. While Sylvia said she felt and heard her back pop, no one else present confirmed that. While Sylvia said, *at one time,* that she immediately felt radiating pain, Marta stated that the group laughed and giggled throughout the incident. While Sylvia testified that she immediately notified the administrator of the injury, the administrator said she mentioned nothing until a week later. While Sylvia said that the injury occurred on May 11th, Kathy remembered her stating that it occurred on the 12th. While Sylvia said she visited a doctor on May 17th because of her back injury, Kathy understood it was to have a lump on her hip checked. While Sylvia said her pain became debilitating over the ensuing days, others said that she appeared normal and acted similarly. While Sylvia said, at one point, that she suffered no pain at the time of injury, she later wavered by asserting that she either suffered some pain which later grew worse or suffered immediate pain which radiated through her hip.[1]

So too did the record reflect potential motive on the part of Sylvia for fabricating portions of her testimony. Again, she was supposedly on the brink of discharge for insubordination immediately before suffering her back injury.[2]

---

1. Interestingly, Dr. James Diede, who testified by deposition on behalf of Sylvia, remarked that his records "did not reflect her reporting ... immediate pain."

2. By this we do not suggest that she actually concocted testimony or that she was the only witness motivated to recall facts in a manner deviating from the truth. Yet, the circumstances

Moreover, the testimony of Oscar Trevino was not so corroborative of Sylvia's to render the latter beyond disrepute. He simply stated that she appeared normal when leaving for work on the morning of May 11th and that she limped and complained of pain upon returning that evening. Though the supportive nature of the testimony was obvious, in considering it, the jurors were not obligated to *ignore his relationship to Sylvia or his interest in obtaining a favorable verdict.* Nor did law compel the jury to assign greater weight to his perceptions of her physical well-being than to those of her co-worker and boss.

Nor can it be said that the deposition testimony of Dr. James Diede raised her testimony above suspicion. Though he concluded that she suffered from an injury to a "facet joint" in her back, he was not present when it supposedly occurred. More importantly, in rendering his opinion as to the cause, he expressly stated that he "assume[d]" it happened at work "based upon her history . . . *her story [ ] that she tells us.*" (Emphasis added).[3]

In short, we cannot say that the evidence imparted to the jury by Sylvia, her husband, and Dr. Diede was so clear, direct, positive, consistent, and beyond suspicion as to require the trial court to withhold the case from the jury or to grant a judgment notwithstanding verdict. That she was injured appeared relatively undisputed. That she was injured *during the course of employment* involved questions of fact and witness credibility. Thus, resolution of the dispute by a jury was needed.

### 2. That Kent County Terminated Sylvia Because of Her Compensation Claim

■ The evidence allegedly establishing, as a matter of law, that Kent County terminated Sylvia because she filed a worker's compensation claim consisted of 1) Kathy "dismissing" Sylvia "on a medical leave of absence" without Sylvia first submitting a

"written request," 2) Kathy failing to reinstate her to full-time status once the doctors released her for, and after Sylvia represented that she could only perform "light-duty" work, 3) Kathy contacting Sylvia's physicians to determine the type and amount of work their patient could perform, 4) Kathy eventually reinstating Sylvia "on an as needed basis" after she completed another application for employment, 5) Kathy requiring Sylvia to undergo retraining, 6) other employees acting "very distant toward" Sylvia after she returned, 7) Sylvia not feeling "as comfortable working there as she did before," 8) Kathy utilizing other employees to do the tasks Sylvia once did, and 9) Kathy failing to immediately create a full-time position for Sylvia or tender back her previous job.

Against the foregoing evidence, which appellants all but admitted was circumstantial, the jury had to weigh Kathy's statements. For instance, she unhesitatingly represented that the nursing home neither discriminated against nor mistreated Sylvia "in any way" for filing a worker's compensation claim or a lawsuit. So too did she inform the jury that she never terminated Ms. Trevino. Quite the contrary, Sylvia was viewed as having "been on a medical leave of absence." Moreover, her employment relationship with the home did not end until Sylvia unilaterally quit on July 20, 1995, and after the home extended to her a permanent, part-time position. These comments alone created fact issues which the court could not decide.

Yet, other evidence appeared of record which further required submission of the cause to the jury. For instance, Kathy testified 1) that requiring completion of another application was a method of updating the returning employee's personal information such as phone numbers or health conditions, 2) that retraining facilitated Sylvia's acclimation to the demands of a new supervisor, Marta, and to the dangers and uses of new

surrounding the claim of injury were indicia which the jury could have considered in rendering its verdict.

**3.** We have difficulty with the Trevinos' notion that one's version of the facts is made incontesta-

ble simply because he or she repeats it to others. That is not the law. At best, repetition illustrates consistency. And though consistency may insinuate accuracy, it does not establish, as a matter of law, veracity.

cleaning chemicals,[4] 3) that reinstating her to her previous position or to a full-time, light-duty position was untenable at the time because neither post existed, 4) that reinstating her as a housekeeper before she received a "100%" release from her doctor was untenable because Sylvia complained that she "was not able to bend, and lift, and sweep, and mop, and do these kinds of things at home,"[5] 5) that contacting her physicians was undertaken to determine what if anything she could do,[6] and 7) that placing her on permanent, full-time status would occur as soon as an opening developed.[7]

So too did Kathy attest that Sylvia "went through the same processes that [she] would have anybody else go through." Though the appellants likened the treatment to that of a newly hired employee, they offered no evidence illustrating that it differed from the treatment normally accorded other employees absent for many months.[8] And, such is a prerequisite to showing discrimination. Indeed, one can only wonder how an employer discriminated against a claimant without proof that the claimant was treated differently than others similarly situated.

Simply put, the jury was asked to determine whether the nursing home "discharged or in any other manner discriminated against Sylvia ... because ... [she] filed a workers' compensation claim in good faith." The burden of proof was hers, TEX. LAB. CODE ANN.

§ 451.002(c) (Vernon 1996), to establish a causal relationship between her claim and the alleged discriminatory conduct of her employer. *Trevino v. Corrections Corp.*, 850 S.W.2d 806, 808 (Tex.App.—El Paso 1993, writ denied). The evidence admitted at bar was sufficient to enable the jury to lawfully conclude that Kent County did not reinstate Sylvia as a housekeeper solely because she was unable to perform the various tasks required of the job or because the position was unavailable.

▆ It must be remembered that an employer is free to deny work to those incapable of performing the job. *Tri–County Elec. Coop. v. Tidwell*, 859 S.W.2d 109, 113 (Tex.App.—Fort Worth 1993, writ denied) (holding that the employer did not discriminate simply because it would not allow the employee to work without "a full medical release"); *see Schrader v. Artco Bell Corp.*, 579 S.W.2d 534, 540 (Tex.Civ.App.—Tyler 1979, writ ref'd n.r.e.) (holding that the employee must show himself capable of doing that demanded by the job). Similarly, an employer need not fire others or create new positions to avoid liability as long as its actions are free of the taint itemized in § 451.001. The statute does not grant one a right to particular employment; rather, it provides a means of redressing specific misconduct.

4. Again, Kathy testified that Sylvia had difficulty in accepting guidance from her previous supervisor and that the employee was given the option to leave if she could not follow orders. If this were true, as a jury could have found, it would seem that retraining was not only a logical but also a reasonable step. Moreover, Sylvia herself conceded under cross-examination that her supervisors may "do things differently," that garnering knowledge about the use of new chemicals would be important, and that her retraining covered those topics.

5. Sylvia herself admitted that housekeeping was "hard work" which involved bending, twisting, lifting, and mopping. So too did she admit that housekeepers must "be able to do their job." Yet, these were the type of duties which her doctor said she could not do.

6. Indeed, in the fall of 1994 one of Sylvia's doctors gave her an unrestricted release to return to work. Yet, she tendered the document to Kathy along with her personal admonition that

she still suffered of pain so dire that it prevented her from performing housework. Ironically, housework comprised the bulk of her duties at the nursing home. Thus, the question of what work she could do lay before Kathy.

7. By the end of August 1995, Kathy had attempted to remove Sylvia from "as needed" status by offering her two specific days of employment per week. Apparently, a part-time employee planned to return to school, and the soon to be vacant spot was tendered to Sylvia. Yet, she refused it. Interestingly, this happened after suit was filed and shortly before trial.

8. All must remember that the internal operations of an employer are the concern of the employer. Though we may think them inefficient or bad business practice, that is of no consequence. The judiciary may interfere only if they violate some legal prohibition.

## 494

### 3. Remaining Topics Under Points One Through Four

Because we did not find that the Trevinos proved, as a matter of law, that the alleged injury occurred during the course of her employment or that Kent County terminated her for filing a compensation claim, we need not address the remaining issues under points one through four.

### Points of Error Five, Six, and Seven

Through their last three points of error, the Trevinos contended that the jury's decision to deny them relief went against the overwhelming weight and preponderance of the evidence. Our foregoing discussion of the evidence compels us to overrule these points as well. We cannot say that, upon reviewing *all* the evidence of record, the jury's answers to questions one and two were manifestly wrong or clearly unjust. At best, the testimony and documents admitted by the court created fact issues regarding each party's allegations, fact issues which the jury lawfully decided.

Accordingly, we affirm the judgment signed below.