COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-03-052-CV

DAVID MORALES APPELLANT

V.

SIMUFLITE TRAINING APPELLEE

INTERNATIONAL, INC.

------------

FROM THE 153
RD
 DISTRICT COURT OF TARRANT COUNTY

------------

OPINION

------------

Appellant, David Morales (Morales), filed this wrongful termination suit alleging that Appellee, SimuFlite Training International, Inc. (SimuFlite), terminated his employment solely because he refused to commit an illegal act.  SimuFlite moved for a summary judgment dismissing Morales’s claims, which the trial court granted.  In his sole issue on appeal, Morales argues that the trial court erred by granting SimuFlite’s motion for summary judgment.  SimuFlite raises a cross-issue urging this Court, if it reverses the summary judgment, to render judgment on the alternative relief requested in the motion for summary judgment.  Because we hold the trial court erred by granting the motion for summary judgment and decline to address SimuFlite’s cross-issue, we reverse and remand.

Background Facts

SimuFlite is the world’s largest aviation training facility, employing thousands of pilots, crew members, and maintenance technicians from all over the world.  SimuFlite’s headquarters and training facility, located at Dallas-Fort Worth International Airport, provides both classroom instruction and hands-on training through flight simulators.  These training activities are heavily regulated by the Federal Aviation Regulations (FARs) promulgated by the Federal Aviation Administration (FAA).  The training centers, as well as the instructors and evaluators that provide this training, are required to have a FAA training certificate.
(footnote: 1)
 For example, the FARs set forth the requirements regarding obtaining and maintaining instructor and evaluator certification,
(footnote: 2) the number of flight instructors and evaluators at a training center,
(footnote: 3) the records that must be maintained for each instructor and evaluator showing that the instructor or evaluator has completed all regulatory requirements,
(footnote: 4) and when or how an instructor’s or evaluator’s certificate terminates.
(footnote: 5)  Additionally, under the FARs a certified training center is authorized to certify that its client-pilots have met FAA certification requirements.
(footnote: 6)
 At all times material to this case, Morales was a part-time employee of SimuFlite.  On October 31,1999, Morales’s FAA instructor certification expired, and to get it renewed, Morales had to meet certain flight time and procedural requirements.
(footnote: 7)  Morales repeatedly asked SimuFlite to provide him with the appropriate training.  He did not, however, obtain the necessary flight time to renew his certification.

Knowing that Morales had not met the requirements to renew his certification, SimuFlite marked him in the computer system as a conflict so that Morales would not be scheduled as the instructor for the specific training Morales was no longer certified to provide.  On March 17–18, 2000, despite the computer flag, Morales was scheduled to provide training he was no longer qualified to provide.  When Morales told his supervisor Dennis Sherman (Sherman) that he was not qualified to provide the scheduled training, Sherman instructed Morales to put the pilots in the simulator anyway and allow the pilots to practice.  Sherman also instructed Morales not to sign any of the client-pilots’ training records.  The following week, without Morales’s knowledge, Sherman signed off on the pilots’ training records using his own instructor number.

In a letter dated April 18, 2000, the FAA informed SimuFlite that the FAA had begun an investigation regarding simulator training provided by Morales and that SimuFlite had ten days to respond to the letter.  After receiving the letter on April 24th, SimuFlite began its own internal investigation.  SimuFlite’s investigation revealed that Morales had been the instructor in the simulator March 17–18, not Sherman as SimuFlite’s records showed.  When SimuFlite realized this FAA violation existed, there is evidence in the summary judgment record that, Sherman asked Morales to sign a blank flight report form (FRF).  Morales refused to sign the FRF because he had not taken a flight to report and he was concerned that SimuFlite would falsify it to cure the FAA training violation that was being investigated.  Following Morales’s initial refusal, Sherman and Lewis Smalley (Smalley), the senior manager, again asked Morales to sign the blank FRF.  Morales again refused.

Consequently, Sherman was given the opportunity to resign, in lieu of being fired, and he chose to resign.  On May 5, 2000, SimuFlite terminated Morales’s employment.  By letter also dated May 5th, SimuFlite responded to the FAA investigation letter, stating that training had been given in violation of FAA regulations, that the violations were due to two rogue employees, and that SimuFlite was taking care of the problem.  By letter dated May 23, 2000, the FAA acknowledged SimuFlite’s letter and instructed SimuFlite that, because Morales and Sherman were no longer employed by SimuFlite, their FAA instructor certificates had to be revoked.

Believing that he was fired solely because he refused to sign the blank FRF, and that signing it would have subjected him to a criminal penalty, Morales filed this suit.  SimuFlite then filed a motion for both traditional and no-evidence summary judgment asking the trial court to dismiss all of Morales’s claims or, in the alternative, to limit Morales’s damages and attorney’s fees.  The trial court granted SimuFlite summary judgment dismissing all of Morales’s claims.  Morales now appeals.

Standards of Review

In a traditional summary judgment case, the issue on appeal is whether the movant met his summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.
(footnote: 8)  The burden of proof is on the movant, and all doubts about the existence of a genuine issue of material fact are resolved against the movant.
(footnote: 9)  Therefore, we must view the evidence and its reasonable inferences in the light most favorable to the nonmovant.
(footnote: 10)
 In deciding whether there is a material fact issue precluding summary judgment, all conflicts in the evidence are disregarded and the evidence favorable to the nonmovant is accepted as true.
(footnote: 11)  Evidence that favors the movant's position will not be considered unless it is uncontroverted.
(footnote: 12)
 The summary judgment will be affirmed only if the record establishes that the movant has conclusively proved all essential elements of the movant's cause of action or defense as a matter of law.
(footnote: 13)
 If the uncontroverted evidence is from an interested witness, it does nothing more than raise a fact issue unless it is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted.
(footnote: 14)
 A defendant is entitled to summary judgment if the summary judgment evidence establishes, as a matter of law, that at least one element of a plaintiff’s cause of action cannot be established.
(footnote: 15)  The defendant as movant must present summary judgment evidence that negates an element of the plaintiff’s claim.
(footnote: 16)  Once the defendant produces sufficient evidence to establish the right to summary judgment, the burden shifts to the plaintiff to come forward with competent controverting evidence raising a genuine issue of material fact with regard to the element challenged by the defendant.
(footnote: 17)
 In a no-evidence summary judgment case, the party without the burden of proof may, after an adequate time for discovery and without presenting evidence, move for summary judgment on the ground that there is no evidence to support an essential element of the nonmovant's claim or defense.
(footnote: 18)  The motion must specifically state the elements for which there is no evidence.
(footnote: 19)  The trial court must grant the motion unless the nonmovant produces summary judgment evidence that raises a genuine issue of material fact.
(footnote: 20)  We review the evidence in the light most favorable to the party against whom the no-evidence summary judgment was rendered.
(footnote: 21)  If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary judgment is not proper.
(footnote: 22)
Wrongful Termination

In his sole issue, Morales argues that the trial court erred in granting SimuFlite’s motion for summary judgment because there are genuine issues of material fact regarding whether he was asked to perform an illegal act and whether his refusal to perform the illegal act was the sole reason for his termination.

It is well settled law in Texas that employment for an indefinite term may be terminated at will and without cause.
(footnote: 23)  Morales does not dispute that he was an employee at will; instead he argues that he fits within an exception to the employment-at-will doctrine.  In 
Sabine Pilot
, the Texas Supreme Court created a narrow exception to the termination-at-will policy.
(footnote: 24)  Under the 
Sabine Pilot
 exception, an employee may maintain a common law claim for wrongful termination if the sole reason for the employee’s termination was his refusal to perform an illegal act.
(footnote: 25)  In other words, an employee may recover if he was “unacceptably forced to choose between risking criminal liability or being discharged.”
(footnote: 26)
 Accordingly, to avoid summary judgment in this case, Morales first had to present a scintilla of evidence that genuine issues of material fact exist regarding whether he was asked and refused to perform an illegal act that would subject him to criminal penalty.

Morales argues that Simulflite asked him to sign a blank FRF that is used to verify flights taken in accordance with FAA regulations.
(footnote: 27)  Because the FAA was already investigating SimuFlite when SimuFlite allegedly asked Morales to sign the FRF, Morales believed that SimuFlite wanted him to sign it so that SimuFlite could fill in a flight that Morales had never taken to resolve FAA regulation problems and avoid fines and sanctions.  Morales refused to sign the blank FRF because doing so would have subjected him to a criminal penalty under 18 U.S.C.A. § 1001 for knowingly and willfully “mak[ing] or us[ing] any false writing or document knowing the same to contain materially false, fictitious, or fraudulent statement or entry” to the FAA.
(footnote: 28)
 SimuFlite contends that even if the blank FRF had been falsified after he signed it to show that he flew when in fact he did not, the falsification would in no way have subjected Morales to a criminal penalty because he would not have been the one falsifying the document.  Further, SimuFlite argues that Morales could not be charged with aiding and abetting under 18 U.S.C.A. § 1001 because there is no such offense, and even if there were, he would not have had the necessary mens rea.  SimuFlite argues that because a corporation can be charged with this offense and SimuFlite would have been the party committing the fraud, Morales could not have  been convicted.  These arguments are completely without merit.

Under federal law, Morales could have been charged, at the very least, with aiding and abetting the falsification of the FRF
(footnote: 29) regardless of whether he knew what SimuFlite would write in it or whether he knew the FRF would be presented to the FAA.
(footnote: 30)  “[A]iding and abetting is proven if a defendant voluntarily gives false information or participates in a plan such that 
it is foreseeable that false information will be used in statements made to a government agency
 in order to further the plan.”
(footnote: 31)  Morales believed that there was no valid reason to sign the blank FRF, and he testified at his deposition that Sherman told him “that he was going to try to get me off the hook.”  Because he foresaw that SimuFlite could later falsify the blank FRF he was asked to sign, if the FRF had been falsified Morales would have been subject to a criminal penalty as an aider or abettor for participating in the falsification.
(footnote: 32)
 Furthermore, SimuFlite asserts that Morales could not be charged under § 1001 for falsifying the FRF because the FRF is only an internal document and would never be submitted to or viewed by the FAA.  The fact that SimuFlite only used FRFs internally, did not relieve Morales of any possibility of being charged under the statute.
(footnote: 33)  For criminal liability to arise under § 1001, it is not necessary that the statement actually be submitted to the FAA, but only that it was contemplated that the statement would have a natural tendency to influence, be capable of influencing, or be utilized by the FAA.
(footnote: 34)
 SimuFlite kept these FRFs in its records because it was required to maintain them under FAA regulations.
(footnote: 35)  When the FAA investigates violations of certification requirements, or any other time the FAA makes a request, the FRFs must be provided.
(footnote: 36)  Thus, the FRFs are clearly capable of influencing or being utilized by the FAA.  Viewing all this evidence in the light most favorable to Morales, we hold that it raises genuine issues of material fact regarding whether SimuFlite asked him to perform an illegal act.

There is also more than a scintilla of evidence that genuine issues of material fact exist regarding whether Morales’s refusal to sign the blank FRF was the sole reason for his termination.

At his deposition and in statements made part of the summary judgment evidence, Morales testified that he knew he was not qualified to give the training at issue and that he brought this fact to SimuFlite’s attention.  He testified that SimuFlite, however, instructed him to proceed with the training, which Morales assumed would be considered practice or “free time” for the pilots in the simulator, and that SimuFlite would “talk to them later” and let them know that they could not use this training for FAA certification purposes.  Following the training, and without Morales’s knowledge, SimuFlite, through Sherman, prepared false pilots’ training records showing that an instructor other than Morales had performed the training.  Morales testified that after the altered records became the subject of the FAA investigation, SimuFlite told him that they needed to find a way to “get him off the hook,” and on multiple occasions asked him to sign the blank FRF.  There is also evidence in the summary judgment record that SimuFlite told Morales that his refusal to sign the FRF required his termination.

At the termination meeting, SimuFlite also provided Morales with a memo dated two days earlier referencing a discussion between SimuFlite and Morales.  Morales testified that this discussion never took place.  The same day Morales was terminated, SimuFlite admitted to the FAA that the flight training documents had been falsified, and later informed the FAA they had taken care of the problem because Sherman and Morales were no longer employed by SimuFlite.

This evidence raises a genuine issue of material fact concerning whether Morales’s failure to sign the document was the sole cause of his termination.
(footnote: 37)
 SimuFlite contends that even if there is evidence that Morales was fired for refusing to sign the FRF—which it denies—his refusal was not the sole cause for his termination.  When juxtaposed, however, to Morales’s testimony the alternative reasons merely raise a fact issue concerning the reason for his termination.
(footnote: 38)
 Because there is sufficient evidence of genuine issues of material fact regarding Morales’s 
Sabine Pilot
 claim, the trial court erred in granting summary judgment.  We sustain Morales’s issue.

Cross-Issue

SimuFlite raises a cross-issue asking this Court to render judgment on the alternative relief.  In its motion for summary judgment, SimuFlite requested that if the trial court denied summary judgment, damages and attorneys fees should nevertheless be limited.  This was not a ground for summary judgment; it was a request for alternative relief should summary judgment be denied.
(footnote: 39)  Because the trial court granted SimuFlite summary judgment dismissing Morales’s claims, it necessarily did not reach this question of alternative relief.  We decline to address this unrelated issue.

Conclusion

Having sustained Morales’s issue on appeal and having declined to address SimuFlite’s cross-issue, we reverse the trial court’s judgment and remand this case for trial.

LEE ANN DAUPHINOT

JUSTICE

PANEL B: LIVINGSTON, DAUPHINOT, and HOLMAN, JJ.

DELIVERED: March 18, 2004

FOOTNOTES
1:
See
 14 C.F.R. §§ 142.5, .13 (2003).

2:
See id
. §§ 142.47, .53, .55.

3:
See id
. § 142.13.

4:
See id
. § 142.73.

5:
See id
. § 183.15.

6:
See id
. § 142.49.

7:
See id
. §§ 142.53, .55.

8:
Tex. R. Civ. P.
 166a(c); 
S.W. Elec. Power Co. v. Grant
, 73 S.W.3d 211, 215 (Tex. 2002); 
City of Houston v. Clear Creek Basin Auth.
, 589 S.W.2d 671, 678 (Tex. 1979).

9:
S.W. Elec. Power Co.
, 73 S.W.3d at 215; 
Rhone-Poulenc
,
 Inc. v. Steel
, 997 S.W.2d 217, 223 (Tex. 1999); 
Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.
, 391 S.W.2d 41, 47 (Tex. 1965).

10:
Great Am.
, 391 S.W.2d at 47.

11:
Rhone-Poulenc
, 997 S.W.2d at 223; 
Harwell v. State Farm Mut. Auto. Ins. Co.
, 896 S.W.2d 170, 173 (Tex. 1995).

12:
Great Am.
, 391 S.W.2d at 47.

13:
Clear Creek Basin
, 589 S.W.2d at 678.

14:
Tex. R. Civ. P.
 166a(c); 
Trico Techs. Corp. v. Montiel
, 949 S.W.2d 308, 310 (Tex. 1997).

15:
Elliott-Williams Co. v. Diaz
, 9 S.W.3d 801, 803 (Tex. 1999).

16:
Centeq Realty, Inc. v. Siegler
, 899 S.W.2d 195, 197 (Tex. 1995).

17:
Id.

18:
Tex. R. Civ. P.
 166a(i).

19:
Id
.; 
Johnson v. Brewer & Pritchard, P.C.
, 73 S.W.3d 193, 207 (Tex. 2002).

20:
See
 
Tex. R. Civ. P.
 166a(i) & cmt.; 
S.W. Elec. Power Co. v. Grant
, 73 S.W.3d 211, 215 (Tex. 2002).

21:
Johnson
, 73 S.W.3d at 197; 
Morgan v. Anthony
, 27 S.W.3d 928, 929 (Tex. 2000).

22:
Moore v. K Mart Corp.
, 981 S.W.2d 266, 269 (Tex. App.—San Antonio 1998, pet. denied).

23:
Tex. Farm Bureau Mut. Ins. Cos. v. Sears
, 84 S.W.3d 604, 608 (Tex. 2002); 
Burt v. City of Burkburnett
, 800 S.W.2d 625, 626 (Tex. App.—Fort Worth 1990, writ denied); 
Simmons Airlines v. Lagrotte
, 50 S.W.3d 748, 751–52 (Tex. App.—Dallas 2001, pet. denied).

24:
Sabine Pilot Serv., Inc. v. Hauck
, 687 S.W.2d 733, 735 (Tex. 1985).

25:
Id
.

26:
Winters v. Houston Chronicle Publ’n Co.
, 795 S.W.2d 723, 724 (Tex. 1990).

27:
See
 14 C.F.R. § 142.73.

28:
18 U.S.C.A. § 1001 (West 2003).

29:
See
 18 U.S.C.A. § 2; 
United States v. Dunne
, 342 F.3d 1158, 1163 (10th Cir. 2003); 
see also
 NTSB Bar Ass’n, Select Comm. on Aviation Pub. Policy, 
Aviation Professionals and the Threat of Criminal Liability—How Do We Maximize Aviation Safety?
, 67 
J. Air L. & Com
. 875, 915 n.156 (2002) [hereinafter NTSB Bar Ass’n].

30:
See United States v. Knoll
, 116 F.3d 994, 995 (2nd Cir. 1997); 
United States v. Fairchild
, 990 F.2d 1139, 1141 (9th Cir. 1993); 
United States v. Tramargo
, 637 F.2d 346, 351 (5th Cir. 1981); 
United States v. Beck
, 615 F.2d 441, 453 (7th Cir. 1980); 
United States v. Daileda
, 229 F. Supp. 148, 150–51 (M.D. Penn. 1964).

31:
Beck
, 615 F.2d at 453 (emphasis added).

32:
See United States v. Hicks
, 619 F.2d 752, 757 (8th Cir. 1980); 
United States v. Lanier
, 578 F.2d 1246, 1250 (8th Cir. 1978); 
see also Nye & Nissen v. United States
, 336 U.S. 613, 618–20, 69 S. Ct. 766, 769–70 (1949); 
United States v. Kubeck
, 487 F.2d 1256, 1259 (6th Cir. 1973); 
Driver v. United States
, 199 F.2d 860, 861 (5th Cir. 1952).

33:
See United States v. Dick
, 744 F.2d 546, 553 (7th Cir. 1984); 
United States v. Sprecher
, 783 F. Supp. 133, 157 (S.D.N.Y. 1992).

34:
Dick
, 744 F.2d at 553; 
Sprecher
, 783 F. Supp. at 157.

35:
See
 14 C.F.R. § 142.73; 
see generally
 NTSB Bar Ass’n, 
supra
 note 29, at 886–87.

36:
14 C.F.R. § 142.73(d).

37:
See Hawthorne v. Star Enter., Inc.
, 45 S.W.3d 757, 760 (Tex. App.—Texarkana 2001, pet. denied).

38:
See, e.g.
, 
VingCard A.S. v. Merrimac Hospitality Sys., Inc.
, 59 S.W.3d 847, 863–64 (Tex. App.—Fort Worth 2001, pet. denied); 
Cain v. Pruett
, 938 S.W.2d 152, 159 (Tex. App.—Dallas 1996, no writ); 
Trevino v. Kent County
, 936 S.W.2d 488, 490 (Tex. App.—Amarillo 1996, writ denied).

39:
See Cincinnati Life Ins. Co. v. Cates
, 927 S.W.2d 623, 625–26 (Tex. 1996).