COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

  

NO. 2-03-052-CV

 
  

DAVID
MORALES                                                                  APPELLANT

  

V.

  

SIMUFLITE
TRAINING                                                               APPELLEE

INTERNATIONAL,
INC.

  

------------

  

FROM
THE 153RD DISTRICT COURT OF TARRANT COUNTY

  

------------

  

OPINION

  

------------

        Appellant,
David Morales (Morales), filed this wrongful termination suit alleging that
Appellee, SimuFlite Training International, Inc. (SimuFlite), terminated his employment solely because he
refused to commit an illegal act. SimuFlite
moved for a summary judgment dismissing Morales’s claims, which the trial court
granted. In his sole issue on appeal, Morales argues
that the trial court erred by granting SimuFlite’s
motion for summary judgment. SimuFlite
raises a cross-issue urging this Court, if it reverses the summary judgment, to
render judgment on the alternative relief requested in the motion for summary
judgment. Because we hold the trial court erred by
granting the motion for summary judgment and decline to address SimuFlite’s cross-issue, we reverse and remand.

Background
Facts

        SimuFlite is the world’s largest aviation training
facility, employing thousands of pilots, crew members, and maintenance
technicians from all over the world. SimuFlite’s headquarters and training facility, located at
Dallas-Fort Worth International Airport, provides both classroom instruction
and hands-on training through flight simulators. These
training activities are heavily regulated by the Federal Aviation Regulations (FARs) promulgated by the Federal Aviation Administration
(FAA). The training centers, as well as the
instructors and evaluators that provide this training, are required to have a
FAA training certificate.[1]



        For
example, the FARs set forth the requirements
regarding obtaining and maintaining instructor and evaluator certification,[2] the number of flight instructors
and evaluators at a training center,[3] the records that must be
maintained for each instructor and evaluator showing that the instructor or
evaluator has completed all regulatory requirements,[4] and when or how an
instructor’s or evaluator’s certificate terminates.[5]  Additionally, under
the FARs a certified training center is authorized to
certify that its client-pilots have met FAA certification requirements.[6]

        At
all times material to this case, Morales was a part-time employee of SimuFlite. On October 31,1999, Morales’s FAA instructor certification expired, and
to get it renewed, Morales had to meet certain flight time and procedural requirements.[7]  Morales repeatedly
asked SimuFlite to provide him with the appropriate
training. He did not, however, obtain the necessary
flight time to renew his certification.

        Knowing
that Morales had not met the requirements to renew his certification, SimuFlite marked him in the computer system as a conflict
so that Morales would not be scheduled as the instructor for the specific
training Morales was no longer certified to provide. On
March 17–18, 2000, despite the computer flag, Morales was scheduled to provide
training he was no longer qualified to provide. When
Morales told his supervisor Dennis Sherman (Sherman) that he was not qualified
to provide the scheduled training, Sherman instructed Morales to put the pilots
in the simulator anyway and allow the pilots to practice. Sherman
also instructed Morales not to sign any of the client-pilots’ training records. The following week, without Morales’s knowledge, Sherman
signed off on the pilots’ training records using his own instructor number.

        In a
letter dated April 18, 2000, the FAA informed SimuFlite
that the FAA had begun an investigation regarding simulator training provided
by Morales and that SimuFlite had ten days to respond
to the letter. After receiving the letter on April
24th, SimuFlite began its own internal investigation. SimuFlite’s investigation
revealed that Morales had been the instructor in the simulator March 17–18, not
Sherman as SimuFlite’s records showed. When SimuFlite realized this FAA
violation existed, there is evidence in the summary judgment record that,
Sherman asked Morales to sign a blank flight report form (FRF). Morales refused to sign the FRF
because he had not taken a flight to report and he was concerned that SimuFlite would falsify it to cure the FAA training
violation that was being investigated. Following
Morales’s initial refusal, Sherman and Lewis Smalley (Smalley), the senior
manager, again asked Morales to sign the blank FRF. Morales again refused.

        Consequently,
Sherman was given the opportunity to resign, in lieu of being fired, and he
chose to resign. On May 5, 2000, SimuFlite
terminated Morales’s employment. By letter also dated
May 5th, SimuFlite responded to the FAA investigation
letter, stating that training had been given in violation of FAA regulations,
that the violations were due to two rogue employees, and that SimuFlite was taking care of the problem.
By letter dated May 23, 2000, the FAA acknowledged SimuFlite’s
letter and instructed SimuFlite that, because Morales
and Sherman were no longer employed by SimuFlite,
their FAA instructor certificates had to be revoked.

        Believing
that he was fired solely because he refused to sign the blank FRF, and that signing it would have subjected him to a
criminal penalty, Morales filed this suit. SimuFlite then filed a motion for both traditional and
no-evidence summary judgment asking the trial court to dismiss all of Morales’s
claims or, in the alternative, to limit Morales’s damages and attorney’s fees. The trial court granted SimuFlite
summary judgment dismissing all of Morales’s claims. Morales
now appeals.

Standards
of Review

        In a
traditional summary judgment case, the issue on appeal is whether the movant met his summary judgment burden by establishing that
no genuine issue of material fact exists and that the movant
is entitled to judgment as a matter of law.[8]  The burden of proof
is on the movant, and all doubts about the existence
of a genuine issue of material fact are resolved against the movant.[9]  Therefore, we must
view the evidence and its reasonable inferences in the light most favorable to
the nonmovant.[10]

        In
deciding whether there is a material fact issue precluding summary judgment,
all conflicts in the evidence are disregarded and the evidence favorable to the
nonmovant is accepted as true.[11]  Evidence that favors
the movant's position will not be considered unless
it is uncontroverted.[12]

        The
summary judgment will be affirmed only if the record establishes that the movant has conclusively proved all essential elements of
the movant's cause of action or defense as a matter
of law.[13]

        If
the uncontroverted evidence is from an interested witness, it does nothing more
than raise a fact issue unless it is clear, positive and direct, otherwise
credible and free from contradictions and inconsistencies, and could have been
readily controverted.[14]

        A
defendant is entitled to summary judgment if the summary judgment evidence
establishes, as a matter of law, that at least one element of a plaintiff’s
cause of action cannot be established.[15]  The defendant as movant must present summary judgment evidence that negates
an element of the plaintiff’s claim.[16]  Once the defendant
produces sufficient evidence to establish the right to summary judgment, the
burden shifts to the plaintiff to come forward with competent controverting evidence raising a genuine issue of material
fact with regard to the element challenged by the defendant.[17]

        In a
no-evidence summary judgment case, the party without the
burden of proof may, after an adequate time for discovery and without
presenting evidence, move for summary judgment on the ground that there
is no evidence to support an essential element of the nonmovant's
claim or defense.[18] The motion must
specifically state the elements for which there is no evidence.[19]  The trial court must
grant the motion unless the nonmovant produces
summary judgment evidence that raises a genuine issue of material fact.[20]  We review the
evidence in the light most favorable to the party against whom the no-evidence
summary judgment was rendered.[21] 
If the nonmovant brings forward more than a scintilla
of probative evidence that raises a genuine issue of material fact, then a
no-evidence summary judgment is not proper.[22]

Wrongful
Termination

        In
his sole issue, Morales argues that the trial court erred in granting SimuFlite’s motion for summary judgment because there are
genuine issues of material fact regarding whether he was asked to perform an
illegal act and whether his refusal to perform the illegal act was the sole
reason for his termination.

        It is
well settled law in Texas that employment for an indefinite term may be
terminated at will and without cause.[23]  Morales does not
dispute that he was an employee at will; instead he argues that he fits within
an exception to the employment-at-will doctrine. In Sabine
Pilot, the Texas Supreme Court created a narrow exception to the
termination-at-will policy.[24] 
Under the Sabine Pilot exception, an employee may maintain a common law
claim for wrongful termination if the sole reason for the employee’s
termination was his refusal to perform an illegal act.[25]  In other words, an
employee may recover if he was “unacceptably forced to choose between risking
criminal liability or being discharged.”[26]

        Accordingly,
to avoid summary judgment in this case, Morales first had to present a
scintilla of evidence that genuine issues of material fact exist regarding
whether he was asked and refused to perform an illegal act that would subject
him to criminal penalty.

        Morales
argues that Simulflite asked
him to sign a blank FRF that is used to verify
flights taken in accordance with FAA regulations.[27]  Because the FAA was
already investigating SimuFlite when SimuFlite allegedly asked Morales to sign the FRF, Morales believed that SimuFlite
wanted him to sign it so that SimuFlite could fill in
a flight that Morales had never taken to resolve FAA regulation problems and
avoid fines and sanctions. Morales refused to sign the
blank FRF because doing so would have subjected him
to a criminal penalty under 18 U.S.C.A. § 1001 for
knowingly and willfully “mak[ing]
or us[ing] any false writing or document knowing the
same to contain materially false, fictitious, or fraudulent statement or entry”
to the FAA.[28]

        SimuFlite contends that even if the blank FRF had been falsified after he signed it to show that he
flew when in fact he did not, the falsification would in no way have subjected
Morales to a criminal penalty because he would not have been the one falsifying
the document. Further, SimuFlite
argues that Morales could not be charged with aiding and abetting under 18 U.S.C.A. § 1001 because there is no such offense, and even
if there were, he would not have had the necessary mens
rea. SimuFlite
argues that because a corporation can be charged with this offense and SimuFlite would have been the party committing the fraud,
Morales could not have been convicted. These arguments
are completely without merit.

        Under
federal law, Morales could have been charged, at the very least, with aiding
and abetting the falsification of the FRF[29] regardless of whether he knew
what SimuFlite would write in it or whether he knew
the FRF would be presented to the FAA.[30]  “[A]iding and abetting is proven if a defendant voluntarily
gives false information or participates in a plan such that it is
foreseeable that false information will be used in statements made to a
government agency in order to further the plan.”[31]  Morales believed
that there was no valid reason to sign the blank FRF,
and he testified at his deposition that Sherman told him “that he was going to
try to get me off the hook.” Because he foresaw that SimuFlite could later falsify the blank FRF
he was asked to sign, if the FRF had been falsified
Morales would have been subject to a criminal penalty as an aider
or abettor for participating in the falsification.[32]

        Furthermore,
SimuFlite asserts that Morales could not be charged
under § 1001 for falsifying the FRF because the FRF is only an internal document and would never be
submitted to or viewed by the FAA. The fact that SimuFlite only used FRFs internally, did not relieve Morales of any possibility of
being charged under the statute.[33] 
For criminal liability to arise under § 1001, it is not necessary that the
statement actually be submitted to the FAA, but only that it was contemplated
that the statement would have a natural tendency to influence, be capable of
influencing, or be utilized by the FAA.[34]

        SimuFlite kept these FRFs in its
records because it was required to maintain them under FAA regulations.[35]  When the FAA
investigates violations of certification requirements, or any other time the
FAA makes a request, the FRFs must be provided.[36]  Thus, the FRFs are clearly capable of influencing or being utilized
by the FAA. Viewing all this evidence in the light
most favorable to Morales, we hold that it raises genuine issues of material
fact regarding whether SimuFlite asked him to perform
an illegal act.

        There
is also more than a scintilla of evidence that genuine issues of material fact
exist regarding whether Morales’s refusal to sign the blank FRF
was the sole reason for his termination.

        At
his deposition and in statements made part of the summary judgment evidence,
Morales testified that he knew he was not qualified to give the training at
issue and that he brought this fact to SimuFlite’s
attention. He testified that SimuFlite,
however, instructed him to proceed with the training, which Morales assumed
would be considered practice or “free time” for the pilots in the simulator,
and that SimuFlite would “talk to them later” and let
them know that they could not use this training for FAA certification purposes. Following the training, and without Morales’s knowledge, SimuFlite, through Sherman, prepared false pilots’ training
records showing that an instructor other than Morales had performed the
training. Morales testified that after the altered
records became the subject of the FAA investigation, SimuFlite
told him that they needed to find a way to “get him off the hook,” and on
multiple occasions asked him to sign the blank FRF. There is also evidence in the summary judgment record that
SimuFlite told Morales that his refusal to sign the FRF required his termination.

        At
the termination meeting, SimuFlite also provided
Morales with a memo dated two days earlier referencing a discussion between SimuFlite and Morales. Morales
testified that this discussion never took place. The
same day Morales was terminated, SimuFlite admitted
to the FAA that the flight training documents had been falsified, and later
informed the FAA they had taken care of the problem because Sherman and Morales
were no longer employed by SimuFlite.

        This
evidence raises a genuine issue of material fact concerning whether Morales’s
failure to sign the document was the sole cause of his termination.[37]

        SimuFlite contends that even if there is evidence that
Morales was fired for refusing to sign the FRF—which
it denies—his refusal was not the sole cause for his termination. When juxtaposed, however, to Morales’s testimony the
alternative reasons merely raise a fact issue concerning the reason for his termination.[38]

        Because
there is sufficient evidence of genuine issues of material fact regarding
Morales’s Sabine Pilot claim, the trial court erred in granting summary
judgment. We sustain Morales’s issue.

Cross-Issue

        SimuFlite raises a cross-issue asking this Court to render
judgment on the alternative relief. In its motion for
summary judgment, SimuFlite requested that if the trial
court denied summary judgment, damages and attorneys
fees should nevertheless be limited. This was not a
ground for summary judgment; it was a request for alternative relief should
summary judgment be denied.[39]  Because the trial
court granted SimuFlite summary judgment dismissing
Morales’s claims, it necessarily did not reach this question of alternative
relief. We decline to address this unrelated issue.

Conclusion

        Having
sustained Morales’s issue on appeal and having declined to address SimuFlite’s cross-issue, we reverse the trial court’s
judgment and remand this case for trial.

 

 

                                                                  LEE
ANN DAUPHINOT

                                                                  JUSTICE

 
 

PANEL
B:   LIVINGSTON, DAUPHINOT, and HOLMAN, JJ.

DELIVERED: March 18, 2004







 

NOTES

1.  See 14 C.F.R. §§
142.5, .13 (2003).

2.  See id. §§ 142.47, .53,
.55.

3.  See id. § 142.13.

4.  See id. § 142.73.

5.  See id. § 183.15.

6.  See id. § 142.49.

7.  See id. §§ 142.53, .55.

8.  Tex. R. Civ. P. 166a(c); S.W. Elec. Power Co. v. Grant, 73 S.W.3d
211, 215 (Tex. 2002); City of Houston v. Clear Creek Basin Auth., 589 S.W.2d 671, 678 (Tex. 1979).

9.  S.W. Elec. Power Co., 73 S.W.3d at 215; Rhone-Poulenc,
Inc. v. Steel, 997 S.W.2d 217, 223 (Tex. 1999); Great
Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co., 391 S.W.2d 41, 47 (Tex. 1965).

10.  Great Am., 391 S.W.2d at 47.

11.  Rhone-Poulenc, 997 S.W.2d
at 223; Harwell v. State Farm Mut. Auto. Ins. Co., 896 S.W.2d 170, 173 (Tex. 1995).

12.  Great Am., 391 S.W.2d at 47.

13.  Clear Creek Basin, 589 S.W.2d at 678.

14.  Tex. R. Civ. P.
166a(c); Trico Techs. Corp. v. Montiel, 949 S.W.2d 308, 310 (Tex. 1997).

15.  Elliott-Williams Co. v. Diaz, 9 S.W.3d 801,
803 (Tex. 1999).

16.  Centeq Realty,
Inc. v. Siegler, 899 S.W.2d
195, 197 (Tex. 1995).

17.  Id.

18.  Tex. R. Civ. P.
166a(I).

19.  Id.; Johnson v. Brewer & Pritchard,
P.C., 73 S.W.3d 193, 207 (Tex. 2002).

20.  See Tex. R. Civ. P.
166a(i) & cmt.; S.W. Elec.
Power Co. v. Grant, 73 S.W.3d 211, 215 (Tex. 2002).

21.  Johnson, 73 S.W.3d at 197; Morgan v.
Anthony, 27 S.W.3d 928, 929 (Tex. 2000).

22.  Moore v. K Mart Corp., 981 S.W.2d 266, 269 (Tex. App.—San Antonio 1998, pet. denied).

23.  Tex. Farm Bureau Mut. Ins. Cos. v. Sears, 84 S.W.3d 604, 608 (Tex. 2002); Burt
v. City of Burkburnett, 800 S.W.2d 625, 626 (Tex.
App.—Fort Worth 1990, writ denied); Simmons Airlines v. Lagrotte,
50 S.W.3d 748, 751–52 (Tex. App.—Dallas 2001, pet. denied).

24.  Sabine Pilot Serv., Inc. v. Hauck, 687 S.W.2d 733, 735 (Tex. 1985).

25.  Id.

26.  Winters v. Houston Chronicle Publ’n Co., 795 S.W.2d 723,
724 (Tex. 1990).

27.  See 14 C.F.R. §
142.73.

28.  18 U.S.C.A. § 1001 (West
2003).

29.  See 18 U.S.C.A. §
2; United States v. Dunne, 342 F.3d 1158, 1163
(10th Cir. 2003); see also NTSB Bar Ass’n,
Select Comm. on Aviation Pub. Policy, Aviation
Professionals and the Threat of Criminal Liability—How Do We Maximize Aviation
Safety?, 67
J. Air L. & Com. 875, 915 n.156
(2002) [hereinafter NTSB Bar Ass’n].

30.  See United States v. Knoll, 116 F.3d 994, 995 (2nd Cir. 1997); United States v.
Fairchild, 990 F.2d 1139, 1141 (9th Cir. 1993); United
States v. Tramargo, 637 F.2d
346, 351 (5th Cir. 1981); United States v. Beck, 615 F.2d
441, 453 (7th Cir. 1980); United States v. Daileda,
229 F. Supp. 148, 150–51 (M.D. Penn. 1964).

31.  Beck, 615 F.2d at
453 (emphasis added).

32.  See United States v. Hicks, 619 F.2d 752, 757 (8th Cir. 1980); United States v. Lanier,
578 F.2d 1246, 1250 (8th Cir. 1978); see also Nye
& Nissen v. United States, 336 U.S. 613,
618–20, 69 S. Ct. 766, 769–70 (1949); United States v. Kubeck,
487 F.2d 1256, 1259 (6th Cir. 1973); Driver v.
United States, 199 F.2d 860, 861 (5th Cir. 1952).

33.  See United States v. Dick, 744 F.2d 546, 553 (7th Cir. 1984); United States v. Sprecher, 783 F. Supp. 133, 157 (S.D.N.Y.
1992).

34.  Dick, 744 F.2d at
553; Sprecher, 783 F. Supp. at 157.

35.  See 14 C.F.R. §
142.73; see generally NTSB Bar Ass’n, supra note 29, at 886–87.

36.  14 C.F.R. § 142.73(d).

37.  See Hawthorne v. Star Enter., Inc., 45
S.W.3d 757, 760 (Tex. App.—Texarkana 2001, pet. denied).

38.  See, e.g., VingCard
A.S. v. Merrimac Hospitality Sys., Inc., 59
S.W.3d 847, 863–64 (Tex. App.—Fort Worth 2001, pet. denied); Cain v. Pruett,
938 S.W.2d 152, 159 (Tex. App.—Dallas 1996, no writ);
Trevino v. Kent County, 936 S.W.2d 488, 490
(Tex. App.—Amarillo 1996, writ denied).

39.  See Cincinnati Life Ins. Co. v. Cates, 927 S.W.2d 623, 625–26 (Tex. 1996).