NO. 07-08-0022-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL B

JUNE 30, 2009
_____

RONALD MARX, APPELLANT

V.

ELECTRONIC DATA SYSTEMS CORP., APPELLEE
_____

FROM THE 362ND DISTRICT COURT OF DENTON COUNTY;

NO. 2006-40139-362; HONORABLE BRUCE MCFARLING, JUDGE
_____

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

**OPINION**

Appellant Ronald Marx appeals from a summary judgment granted appellee Electronic Data Systems Corporation ("EDS") in his wrongful termination and slander suit. We affirm.

Background

Marx sued EDS for wrongful termination and slander in June 2006, after he resigned his employment with the company in March of that year. Marx, a computer systems

integration specialist with an electrical engineering degree, began working for EDS in November 2000. In April 2004, at his request, he transferred to another department, where he worked in a group performing services for EDS's customer Sabre Holdings, Inc.

Marx's petition alleged he was instructed to engage in behavior that would constitute fraudulent overbilling of Sabre, subjecting him to potential criminal prosecution.[1] He alleged he refused to engage in this behavior and refused to aid and abet other employees in conspiring to do so.

Marx further alleged that after he refused to engage in the overbilling he was subjected to a series of adverse actions by supervisors and co-workers. His petition contained a non-exclusive list of actions that included Marx's exclusion from meetings, unjustified complaints about his not being a team player, other unjustified criticism by his supervisors, and the withholding (by co-workers with the encouragement of supervisors) of information necessary to his work. Further, Marx alleged he was not permitted to pursue required computer integration-related certification, and was not reimbursed, after his 2004 department transfer, for tuition for previously-approved MBA course work. The listed actions also included a demotion and reduction in pay, and the imposition of a performance-improvement plan ("PIP"),[2] despite his "more than adequate performance."

---

[1] In Marx's brief on appeal, he argues his participation in overbilling would have exposed him to prosecution under sections 31.03, 7.02, and 15.02 of the Texas Penal Code and under section 4 of Title 18 of the United States Code. *See* Tex. Penal Code Ann. § 31.03 (Vernon 2007); Tex. Penal Code Ann. § 7.02 (Vernon 2003); Tex. Penal Code Ann. § 15.02 (Vernon 2003), 18 U.S.C. § 4.

[2] The PIP identified tasks required of Marx, including performing certain network engineering tasks for four particular projects. The PIP also identified areas of attendance

Additionally, Marx alleged he was not allowed leave for surgery and other medical care, and was required to disclose privileged medical information. His petition asserted his March 2006 resignation was compelled by his unwillingness to further tolerate such actions, thus he was constructively discharged.

Marx's petition also alleged that before and after his resignation, one or more EDS employees made false, defamatory statements about him to other EDS employees and Sabre employees. Marx alleged that EDS's conduct was accompanied by malice, and sought actual and punitive damages.

After discovery, EDS filed a motion for summary judgment, asserting both traditional and no-evidence grounds. The trial court granted the motion, and entered judgment accordingly. This appeal followed.

Analysis

*Summary Judgment*

When a party moves for summary judgment under both Rule 166a(c) and 166a(i), we will first review the trial court's judgment under the standards of rule 166a(i). If the

---

and communication in which Marx needed to improve, including punctuality at all meetings or other activities and meeting all scheduled deadlines. Marx was also required to be responsive to team members by returning phone calls and emails within a specified period of time. The PIP also notified Marx that his 90-day forecasts were to be submitted at the first of every month. Lastly, the PIP identified the steps to be taken if Marx was unable to come to work and informed him that he was allowed a total of three days as excused absences. A health care provider's statement confirming a medical need for each absence was required.

nonmovant failed to meet its burden by producing more than a scintilla of evidence, there is no need to analyze whether the movant's summary judgment proof satisfied the rule 166a(c) burden. *East Hill Marine, Inc. v. Rinker Boat Co., Inc.*, 229 S.W.3d 813, 816 (Tex.App.–Fort Worth 2007, pet. denied), *citing Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 600 (Tex. 2004). If a trial court grants summary judgment without specifying the grounds on which it relied, as here, the reviewing court must affirm if any of the summary judgment grounds are meritorious. *Sunshine Mining & Refining Co. v. Ernst & Young, L.L.P.,* 114 S.W.3d 48, 51-52 (Tex.App.–Eastland 2003, no pet.).

A no-evidence motion for summary judgment is essentially a pretrial directed verdict and we apply the same legal sufficiency standard in reviewing a no-evidence summary judgment as we apply in reviewing a directed verdict. *Mack Trucks, Inc. v. Tamez,* 206 S.W.3d 572, 582 (Tex. 2006); *City of Keller v. Wilson,* 168 S.W.3d 802, 823 (Tex. 2005); *Goddard v. Northhampton Homeowners Ass'n, Inc.,* 229 S.W.3d 353, 356 (Tex.App.–Amarillo 2007, no pet.). We review the evidence in the light most favorable to the respondent against whom the no-evidence summary judgment was rendered, disregarding all contrary evidence and inferences. *Goddard,* 229 S.W.3d at 356*, citing Merrell Dow Pharms, Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex. 1997).

A no-evidence contention should be sustained where (1) there is complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence conclusively established the

4

opposite of a vital fact. *Merrell Dow,* 953 S.W.2d at 711. A no-evidence summary judgment should not be granted if the respondent counters with more than a scintilla of probative evidence raising a genuine issue of material fact. *Medlock v. Commission for Lawyer Discipline,* 24 S.W.3d 865, 868 (Tex.App.–Texarkana 2000, no pet.); *Lampasas v. Spring Center, Inc.,* 988 S.W.2d 428, 432 (Tex.App.–Houston [14th Dist.] 1999, no pet.). When evidence is so weak as to do no more than create "a mere surmise or suspicion" that a fact exists, the evidence does not exceed a scintilla. *Ridgway,* 135 S.W.3d at 601, quoting *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex. 1983).

*Wrongful Termination Claim*

Marx's wrongful termination claim relies on *Sabine Pilot Service, Inc. v. Hauck,* 687 S.W.2d 733, 735 (Tex. 1985). In Texas, absent a specific agreement to the contrary, an employer may fire an employee at will for good cause, bad cause, or no cause at all. *Montgomery County Hosp. Dist. v. Brown,* 965 S.W.2d 501, 502 (Tex. 1998). In *Sabine Pilot,* 687 S.W.2d at 735, the Texas Supreme Court recognized an exception to the employment-at-will doctrine for an employee discharged "for the sole reason that the employee refused to perform an illegal act." *See also Winters v. Houston Chronicle Publ'g Co.,* 795 S.W.2d 723, 724 (Tex. 1999). The court held that a plaintiff has the burden to prove by a preponderance of the evidence that his discharge was for the sole reason that he refused to perform an illegal act that would subject him to criminal penalties. *Sabine Pilot,* 687 S.W.2d at 735; *City of Midland v. O'Bryant,* 18 S.W.3d 209, 215 (Tex. 2000); *Winters,* 795 S.W.2d at 724.

5

The *Sabine Pilot* exception applies when an employee has been unacceptably forced to choose between risking criminal liability or being discharged from his livelihood. *Winters,* 795 S.W.2d at 724. An employer who discharges an employee both for refusing to perform an illegal act and for a legitimate reason cannot be liable for wrongful discharge under *Sabine Pilot*; the refusal must be the sole cause for the employee's termination. *Tex. Dep't of Human Servs. v. Hinds,* 904 S.W.2d 629, 633 (Tex. 1995); *McClellan v. Ritz-Carlton Hotel Co.,* 961 S.W.2d 463, 464 (Tex.App.–Houston [1st Dist.] 1997, no pet.).

An employee is constructively discharged when job conditions are made so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign. *Kosa v. Dallas Lite & Barricade, Inc.,* 228 S.W.3d 428, 430 (Tex.App.–Dallas 2007, no pet.). The court in *Nguyen v. Technical & Scientific Application, Inc.,* 981 S.W.2d 900 (Tex.App.–Houston [1st Dist.] 1998, no pet.) held the *Sabine Pilot* exception to the employment-at-will doctrine applies to employees who are constructively discharged for the sole reason that they refuse to commit a crime. *Id*. at 902. EDS does not challenge that holding. We agree it is possible for a constructively discharged employee to establish a *Sabine Pilot* claim.

Marx contends the sole reason for his constructive discharge was his refusal to engage in conduct that amounted to criminal activity. EDS asserted four grounds for summary judgment on Marx's wrongful termination claim: (1) Marx was not required to commit a crime; (2) EDS did not know Marx was refusing to perform an illegal act; (3) Marx was not constructively discharged; and (4) Marx's alleged refusal to overbill was not the

6

sole cause of his alleged constructive discharge. We will address two of the grounds, expressing no opinion on the others.

Ground One: Request to commit crime

To prevail under a *Sabine Pilot* cause of action, a plaintiff must prove two things: (1) that the plaintiff refused to perform an illegal act, and (2) that his refusal was the only reason he was terminated. *Hawthorne v. Star Enterprise, Inc.,* 45 S.W.3d 757, 760 (Tex.App.–Texarkana 2001, pet. denied); *see Burt v. City of Burkburnett,* 800 S.W.2d 625, 627 (Tex.App.–Fort Worth 1990, writ denied) (*Sabine Pilot* requires that the employer, in some form, require the employee to commit an illegal act). By its first ground, EDS challenged the evidence it required Marx to engage in fraudulent overbilling.

After careful review of the summary judgment evidence, we find that the phrase "mere surmise or suspicion," *Ridgway,* 135 S.W.3d at 601, aptly describes the evidence that EDS asked Marx to engage in fraudulent overbilling. Marx was one of several network engineers in the group working with Sabre to change Sabre's telephone service from "land-line" to "voice-over IP" technology. Marx testified on deposition his day-to-day duties were varied, including such tasks as "attending conference calls to reading literature, work information, technical documentation, sending e-mails, looking over quotes, looking at other design guides." He estimated 30 percent of his time was devoted to what he considered "technical work." Although other engineers in the group had similar duties, none were precisely like his.[3]

---

[3] He said no one else was "focused on voice."

After his transfer to the group working on the Sabre account, Marx's day-to-day supervisor was Gene Orr. Brian Wheeler, who physically was located in EDS's New York office, became Marx's manager shortly after his transfer to Orr's group.

EDS required employees like Marx to account by hour for their working time. Network engineers entered their working time in a timekeeping system, charging their time to accounts that included both billable and nonbillable work such as administrative tasks.[4] Reviewing the manner in which Marx and other network engineers under his supervision recorded their time was among Orr's duties. The hours devoted to a particular project by the network engineers was at least a factor in determining the amount EDS billed Sabre, and Sabre personnel also reviewed the allocation of billable and nonbillable hours by EDS engineers.

Marx testified his supervisor Orr told him more than once to bill more hours. He described an occasion he and Orr were in Pennsylvania working on a project over a weekend. Marx testified he could not recall how many hours he recorded as billable but Orr commented that Marx did not put down enough hours for the weekend effort,[5] though

---

[4] Orr described the process as follows:

Q:   You do have a role in seeing that time and expenses are reported to those who do the actual billings, correct?
A.   I have a role in charging hours to the projects I do and that my team has.
Q.   Explain what you mean by "charging hours."
A.   We have a labor system and we enter projects or efforts that support our clients.

[5] "Effort" is a term of art in this context, distinguished from a "project." Orr described an "effort" as any "number of activities, whether or not that is (*sic*) administration related or support, asset inventories, things like that." He also noted that some efforts are billable

they worked 36 hours "nonstop." He said Orr told him to correct his time sheet, but he did not do so. He testified there were other instances in which Orr told him he did not record enough billable hours for his work. Marx said he once responded, "I can't do it if I didn't work it."

Marx also testified to statements made by his co-worker Jensen, who was senior to Marx, concerning the recording of billable hours. He described an instance in which Jensen suggested Marx record 24 hours for work that actually had taken them only four hours. He did not do so. Asked if he knew whether Jensen had recorded 24 hours for the task, he responded negatively, and added, "I just know that the suggestion [was] to put down 24 hours for four hours worth of work."[6]

Marx further described an occasion on which he and Jensen were performing a series of repetitive tasks. EDS's preliminary cost estimate for the project allocated two hours for each repetition. Marx testified he pointed out to Jensen that "once you know what you're doing," later repetitions of the task took only about five minutes rather than the estimated two hours. He said Jensen "indicated, [w]ell, just leave it the way it is because that's how it works." Marx further testified that he recorded only his actual time for the work. Asked about Jensen, Marx said Jensen told him he was recording the estimated two

while other efforts are nonbillable.

[6] Then asked if Jensen's suggestion shocked him, Marx replied, "No, because . . . the guy's off the wall." When EDS's counsel, later in the deposition, referred to this occasion as "one instance where you were asked to overbill," Marx responded, "Or insinuated to."

hours for each repetition, and indicated Marx should do the same. Asked if Jensen actually said so, Marx responded, "Well, that was . . . in my opinion, the suggestion."

Marx's testimony concerning Jensen's billing practices and his suggestions or insinuations that Marx should follow his example do not constitute evidence that his employer required Marx to engage in fraudulent overbilling. Moreover, even when they are considered in light of Jensen's comments, neither Orr's instructions to bill more hours nor his instructions to correct his time records on particular projects or efforts permit more than surmise he was thereby asking Marx to do so by means of fraudulently charging his time to billable accounts.[7]

In his deposition, Marx also sometimes referred to his actions as reporting the overbillings of other employees. As one example, he said the company retaliated against him when "I blew the whistle on these guys who were stealing money from [Sabre through overbilling] and [EDS], in turn, put both of them in charge of determining my performance, whether I could keep a job or not." An employee's claim that he was discharged because he reported illegal activities of other employees is not a *Sabine Pilot* claim. *Ed Rachel Fndn. v. D'Unger*, 207 S.W.3d 330, 332 (Tex. 2006) (per curiam) *("Sabine Pilot* protects employees who are asked to *commit* a crime, not those who are asked not to *report* one").

---

[7] Asked if he felt Orr was asking him to do something illegal when Orr told Marx his billable hours were too low, Marx responded, "My guess is yes. That's my assumption because if I don't have enough billable hours – in other words, if I was doing something and it was not in billable work and I don't have enough billable hours, well, wait a minute, why would I have billable hours – 40 billable hours if I didn't work 40 billable hours? There's a problem there."

10

Ground Two: Causation

EDS's no-evidence motion also challenged the evidence that Marx's refusal to engage in criminal overbilling, if such occurred, was the sole reason for his constructive discharge. Initially, Marx urges that the causation element of a *Sabine Pilot* claim must be viewed differently when the plaintiff's discharge was constructive rather than a direct termination. Citing *Nguyen*, 981 S.W.2d at 902, Marx argues the causation issue is whether the plaintiff is constructively discharged for the sole reason that he refuses to commit a crime, "not whether actions against an employee which lead an employee to resign are taken for the sole reason that the employee refuses to commit a crime." We disagree.

As noted, an employee is constructively discharged when job conditions are made so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign. *Kosa,* 228 S.W.3d at 430. *See also Davis v. City of Grapevine,* 188 S.W.3d 748, 766 (Tex.App.–Fort Worth 2006, pet. denied); *Winters v. Chubb & Son, Inc.,* 132 S.W.3d 568, 575 (Tex.App.-Houston [14th Dist.] 2004, no pet.). Or, as the United States Supreme Court has put it, constructive discharge occurs when an employer makes conditions so intolerable that an employee reasonably feels compelled to resign. *Pennsylvania State Police v. Suders*, 542 U.S. 129, 147; 124 S.Ct. 2342, 2354, 159 L.Ed.2d 204 (2004) (describing constructive discharge stemming from hostile work environment); *see also Shawgo v. Spradlin*, 701 F.2d 470, 481 (5th Cir.1983), *cert. denied sub nom., Whisenhunt v. Spradlin*, 464 U.S. 965, 104 S.Ct. 404, 78 L.Ed.2d 345 (1983).

11

Thus, to find a constructive discharge, a court must determine whether a reasonable person in the employee's position would have felt compelled to resign. *Pittman v. Hattiesburg Municipal Separate School District*, 644 F.2d 1071, 1077 (5th Cir.1981). It is necessary to examine the conditions imposed, not the employer's state of mind. *Bourque v. Powell Electrical Manufacturing Co.*, 617 F.2d 61, 65 (5th Cir.1980). An employee thus does not need to prove that the employer subjectively intended to force the employee to resign. *Junior v. Texaco, Inc.,* 688 F.2d 377, 379 (Tex. 1982); *Pittman*, 644 F.2d at 1077. *See also Hammond v. Katy Independent School Dist.,* 821 S.W.2d 174, 177 (Tex.App.–Houston [14th Dist.] 1991, no writ). In making our inquiry, we examine only the conditions imposed, not the state of mind of employer or employee. *Hammond,* 821 S.W.2d at 177.

Whether the employee's discharge was direct or constructive, a *Sabine Pilot* claim requires proof the discharge came about for only one reason, the employee's refusal to perform an illegal act. *See Nguyen*, 981 S.W.2d at 902; *Hinds,* 904 S.W.2d at 633. It follows that when the plaintiff asserts a constructive discharge, the plaintiff need not show the employer intended to force his resignation but the proof must be that the employer, solely because the employee refused to perform an illegal act, made conditions so intolerable the employee reasonably felt compelled to resign. *Nguyen,* 981 S.W.2d at 902; *see Suders*, 542 U.S. at 147; 124 S.Ct. at 2354.

We see no evidence from which a jury properly could infer that the adverse actions to which Marx testified and that he claims led to his departure from EDS occurred solely because he refused to engage in overbilling Sabre. The evidence to which Marx points us demonstrates that the adverse actions he claims led to his resignation occurred later in time than the events he identifies as requests to overbill, and demonstrates he now believes the adverse actions to have been motivated by his refusal to participate in overbilling. But it demonstrates nothing more.

As noted, Marx points to insults from co-workers, the salary reduction, "unfair criticism and discipline threatening termination and precluding transfer," ridicule and isolation, and interference with his medical care as compelling his resignation.[8] Marx does not contend that the insults, ridicule and isolation he suffered from the actions of co-workers stemmed exclusively from his refusal to participate in overbilling, and the summary judgment record provides no basis for such a contention.

The more substantive of the adverse actions occurred in early March 2006, when Wheeler and Orr delivered to Marx his annual employee evaluation in which Marx was rated "Below Expectations" and was given his PIP. At about the same time, he was notified his annual salary would be decreased by about twenty thousand dollars,[9] effective the first of the next month. Orr's instructions to Marx to increase his billable hours occurred

---

[8] Other adverse actions listed in Marx's first amended original petition, including the company's selective refusal to allow him to pursue a required certification and its refusal to reimburse him for previously-approved MBA course work. Those actions are not addressed on appeal.

[9] Before the decrease, Marx's annual salary was about $124,500.

13

during 2005, as did Jensen's suggestions regarding billing practices. Marx's evidence indicates that he made Wheeler and EDS human resources department personnel aware of the "overbilling issue" no later than December 2005. But even under the *but for* causation standard applicable to Title VII retaliation cases, the mere temporal proximity between protected conduct and adverse action is insufficient to show a causal link. *Strong v. University Healthcare Sys., L.L.C.,* 482 F.3d 802, 808 (5th Cir. 2007). *See also Roberson v. Alltel Information Services,* 373 F.3d 647, 656 (5th Cir. 2004) ("[w]ithout more than timing allegations . . . summary judgment in favor of [the defendant] was proper"). Similar argument based on the timing of events surely is also insufficient to demonstrate the sole cause relationship required for a *Sabine Pilot* claim. *See Hinds,* 904 S.W.2d at 633 (comparing the two causation standards).

Neither are Marx's subjective opinions of the motivation for his employer's actions sufficient to raise a fact issue defeating summary judgment. *Texas Division-Tranter, Inc. v. Carrozza*, 876 S.W.2d 312, 314 (Tex. 1994) (retaliatory discharge claim); *Robinson v. The Devereaux Foundation,* No. 14-01-00081-CV, 2002 WL 1315631 (Tex.App.–Houston [14th Dist.] June 6, 2002, pet. denied) (mem. op.) (*Sabine Pilot* claim).

Wheeler, Orr and other EDS employees testified to other reasons for the actions Marx cites. Orr testified he initiated a PIP for Marx because of the frustration he was having with Marx's performance. In particular, Orr was concerned about Marx's "inability to effectively deliver upon his projects." He "thought the appropriate action was to put forth some type of a formal performance-improvement plan."

14

Although he correctly notes the company did not actually reduce his salary until March 2006, Marx acknowledges the subject had been discussed for some time. The evidence shows that Wheeler told him in 2004, shortly after he became Marx's manager, his salary did not match his job code.[10] As Wheeler put it, he told Marx that his salary was "way out of whack for your position title." Wheeler testified that the reason for Marx's salary change was "due to the fact that the role that [Marx] was performing was an infrastructure specialist job, and I was aligning him to that role." Orr also indicated that Marx's salary was reduced "[b]ased on performance issues and the job that [Marx] was performing." He stated Marx's "performance was poor and that he was not performing to an adequate level of the job code that he was in." Further a "job code change would have put [Marx] into a job code category that was more reflective of what his responsibilities were and able to handle."

Marx argues his appeal is supported by *Morales v. SimuFlite Training Intern., Inc.,* 132 S.W.3d 603, 609 (Tex.App.–Fort Worth 2004, no pet.) and *Allen v. Powell,* 989 S.W.2d 776 (Tex.App.–Amarillo 1998) *aff'd in part, rev'd in part, Powell Industries, Inc. v. Allen,* 985 S.W.2d 455 (Tex. 1998). We disagree. Powell produced evidence he was fired because he refused to authorize payment of personal expenses of the president of his company. *Powell,* 989 S.W.2d at 779-81. Evidence in *Morales* showed he was fired for refusing to sign a government-required form in blank. *Morales,* 132 S.W.3d at 609. In the face of that evidence, the appellate courts in both cases found that alternative reasons for

---

[10] When Marx transferred to Orr's group in 2004, the position to which he was transferred carried a different job code than his previous position, but his salary was not changed.

15

the firings did not justify removing the cases from the jury. Both courts said determination of the true reasons for the firings were questions for the fact finders. *Morales,* 132 S.W.3d at 610; *Powell,* 989 S.W.2d at 781-81. Here, by contrast, Marx has not produced more than a scintilla of evidence to meet the causation requirement for his *Sabine Pilot* claim.

We overrule Marx's first issue.

*Slander Claims*

In Marx's second issue, he argues that the trial court erred also in granting summary judgment on his slander claim. EDS challenged Marx's claim by asserting that the statements of which Marx complains are not defamatory. We agree.

Applicable Law

Slander is a defamatory statement orally communicated or published to a third person without legal excuse. *Randall's Food Mkts., Inc. v. Johnson,* 891 S.W.2d 640, 646 (Tex. 1995); *Austin v. Inet Technols., Inc.,* 118 S.W.3d 491, 496 (Tex.App.–Dallas 2003, no pet.)*; AccuBanc Mortgage Corp. v. Drummonds,* 938 S.W.2d 135, 147 (Tex.App.–Fort Worth 1996, writ denied). A statement is defamatory if the words tend to injure a person's reputation, exposing the person to public hatred, contempt, ridicule, or financial injury. *Inet*, 118 S.W.3d at 496; *Cecil v. Frost,* 14 S.W.3d 414, 417 (Tex.App.–Houston [14th Dist.] 2000, no pet.). In a defamation action, the initial question whether the words used were reasonably capable of a defamatory meaning is a question of law to be decided by the trial court. *Musser v. Smith Protective Servs., Inc.,* 723 S.W.2d 653, 645 (Tex. 1987). The court

construes the statement as a whole in light of surrounding circumstances based on how a person of ordinary intelligence would perceive the entire statement. *Id.; Cecil,* 14 S.W.3d at 417. A statement may be false, abusive, unpleasant, or objectionable to the plaintiff but not be defamatory in light of the surrounding circumstances. *Columbia Valley Regional Med. Ctr. v. Bannert,* 112 S.W.3d 193, 198 (Tex.App.–Corpus Christi 2003, no pet.).

The opinion of the plaintiff in a defamation action has no bearing on whether the words or statements at issue are actually defamatory. *Houseman v. Publicaciones Paso del Norte, S.A. DE C.V.,* 242 S.W.3d 518, 524 (Tex.App.–El Paso 2007, no pet.).

Analysis

All of the statements Marx alleges defamed him were made by other members of his work group at EDS. The first was made when Marx entered his work cubicle one day without saying anything while co-workers were holding a conversation on the other side of the cubicle wall. Another network engineer, Annette Harris, said, "I think Ron's over there" and then said "yeah, you know, the sneaky snake is here." The second statement also was made by Harris, this time during a staff meeting. During conversation in the meeting, Marx referred to himself as a "hunt and peck" typist. Harris remarked, "Yeah, you're a slow pecker." The third statement was made on an occasion when Jensen saw Marx sitting in his cubicle. He commented to Harris and another co-worker, Brian Moreno, "Ron doesn't look like a happy camper today." He then told Marx, "you should get on some, you know, happy pills or some–you need some kind of medication." Harris chimed in, adding, "You know, they got medication for your problems."

17

Finally, Marx complains of a comment made about his use of a coffee mug. Once when Marx returned to his desk to find his mug missing, Jensen told Marx there was a mug in the lab he could use. Marx got the mug, washed it, and got coffee. When he returned with the mug, Jensen and Orr were standing together. Jensen said to Orr, "Isn't that your coffee cup, Gene?" Orr responded, saying to Marx, "Yeah, you'd better wash it before you get laid off."

We conclude, as a matter of law, none of the statements was defamatory. Considered in the office context in which they were made, we find that a person of ordinary intelligence would not perceive any of them as injurious to Marx's reputation, exposing him to public hatred, contempt, ridicule, or financial injury. *Musser,* 723 S.W.2d at 655. Even Marx, in his deposition, stated that in isolation each of the comments could be considered jokes or "kidding." Taken together, however, he said they are "[a] little alienation. A little more harassment. A little more degrading nonsense." Nonetheless, the trial court did not err by granting EDS summary judgment against Marx's slander action based on these statements.

Marx also alleged as slanderous a statement made by an EDS manager to a Sabre employee that Marx had not been honest in his disclosures about EDS's billings, and statements made by Harris and Jensen that Marx was "no good" and "could not be trusted." The only summary judgment evidence of the statements came from Marx's deposition. He testified he did not hear the statements, but was told about them by third parties. By motion, EDS asked the trial court to strike Marx's summary judgment evidence of the

18

statements as hearsay and thus improper summary judgment evidence.[11]  EDS's motion

to strike was filed three days before the trial court signed an order stating only it granted

EDS's motion for summary judgment.  The court's order did not address EDS's motion to

strike summary judgment evidence.  About two weeks later, the trial court signed the

judgment from which Marx appeals, which is entitled "Amended Order Granting Defendant's

Motion for Summary Judgment."  That judgment recites the court considered EDS's motion

for summary judgment, Marx's response, and "all evidentiary objections and motions to

strike made in connection with the Motion."

The parties' appellate briefs discuss the issue whether Marx's deposition testimony

to the assertedly slanderous statements was hearsay.  We agree with EDS the testimony

was hearsay.  Marx testified to the out-of-court statements of third parties.  His testimony

was offered to prove the truth of the third parties' statements to him that the slanderers

made the offending statements.  The grant of EDS's motion to strike Marx's testimony to

the statements involved no abuse of discretion. *See Southland Corp. v. Lewis,* 940 S.W.2d

83, 85 (Tex.1997) (holding affidavit contained "clearly inadmissible hearsay" and therefore

was not competent summary judgment proof); *Souder v. Cannon,* 235 S.W.3d 841, 851

(Tex.App.–Fort Worth 2007, no pet.) (holding hearsay objection to statement in affidavit

---

[11]To be considered by the trial or reviewing court, summary judgment evidence must be presented in a form that would be admissible at trial*. Hou-Tex, Inc. v. Landmark Graphics*, 26 S.W .3d 103, 112 (Tex.App.–Houston [14th Dist.] 2000, no pet.).  Hearsay is not proper summary judgment evidence. *Einhorn v. LaChance*, 823 S.W.2d 405, 410 (Tex.App.–Houston [1st Dist.] 1992, writ dism'd w.o.j.) (op. on reh'g) (holding that statements in affidavits based solely on hearsay are inadmissible as summary judgment evidence).

should have been sustained and reviewing court therefore would not consider the statement).

Further, applying case law from the Second Court of Appeals,[12] we find the trial court's statement in its amended order that it "considered" EDS's motion to strike, coupled with its grant of EDS's motion for summary judgment, constituted an implicit granting of the motion to strike as well. *See Frazier v. Yu,* 987 S.W.2d 607, 619 (Tex.App.–Fort Worth 1999, pet. denied) (finding implied ruling sustaining summary judgment movant's objections); *Blum v. Julian*, 977 S.W.2d 819, 823-24 (Tex.App.–Fort Worth 1998, no pet.) (finding implied ruling overruling non-movant's objections). *See also Winn v. Spectrum Primary Care, Inc.,* No. 02-07-038-CV, 2008 WL 1867296 (Tex.App.–Fort Worth April 24, 2008, pet. denied) (mem. op.) (finding implied ruling overruling non-movant's objections).

We overrule Marx's second issue. His two remaining issues dealt with damages. Having affirmed the trial court's disposition of his causes of action against EDS, it is not necessary to address the damage issues. *See* Tex. R. App. P. 47.1.

Accordingly, the judgment of the trial court is affirmed.


James T. Campbell
Justice

---

[12] This appeal was transferred to this Court from the Second Court of Appeals by the Supreme Court of Texas under Government Code section 73.001. Tex. Gov't Code Ann. § 73.001 (Vernon 2005). By rule, we are required to apply the transferor court's case law. Tex. R. App. P. 41.3.