02-11-175-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00175-CV

 

 


 
 
 Lynda W. Tomlinson and husband David Tomlinson
 
 
  
 
 
 APPELLANTS
 
 
 
 
  
 V.
  
 
 
 
 
 John McComas, Cynthia “Cissy” Wilson, Marvin
 Jensen, Tom Roman, and Mike Robinius
 
 
  
 
 
 APPELLEES 
 
 


 

 

----------

 

FROM THE 355th
District Court OF Hood COUNTY

----------

 

MEMORANDUM
OPINION[1]

----------

 

I.  Introduction

          This
is a summary judgment appeal.  Appellants Lynda W. Tomlinson and her husband
David Tomlinson filed suit against Appellees John McComas, Cynthia “Cissy”
Wilson, Marvin Jensen, Tom Roman, and Mike Robinius seeking damages from allegedly
defamatory statements made at a homeowners’ association meeting.  The trial
court granted summary judgment for Appellees and denied the Tomlinsons’ motion
for partial summary judgment.  In a single issue on appeal, the Tomlinsons
argue that the trial court erred by granting summary judgment for Appellees and
by denying the Tomlinsons’ motion for partial summary judgment.  We will
affirm.

II.  Factual
and Procedural Background

          Pecan
Plantation Owners’ Association (PPOA) is a homeowners’ association comprised of
members owning approximately 2,800 homes in the Pecan Plantation subdivision
located near Granbury, Texas.  In 2008, a development group, referred to by the
parties to this appeal as the Anthony Group, sued PPOA over the collection of
road impact fees.  In February 2009, PPOA’s board of directors met to discuss a
proposed settlement of the Anthony Group’s lawsuit.  At the time of that
meeting, Bob Lowrey, Jr. served as president; Lynda Tomlinson served as
treasurer; and McComas and Wilson served as directors on the board.  A motion
was made to approve the settlement, Lynda seconded the motion, and the motion
passed by a seven-to-two margin.  McComas and Wilson voted against accepting
the settlement.

          In
March 2009, Lynda was elected president of PPOA, and she and the directors learned
that past-president Lowrey had gone to work for the Anthony Group on a
part-time basis.  Concerned that some conflict of interest might have existed
between Lowrey and PPOA at the time PPOA’s board voted to approve the settlement
of the Anthony Group lawsuit, PPOA’s directors asked PPOA’s attorney about the
propriety of the settlement agreement and requested guidance on the proper
course of conduct.  PPOA’s attorney responded with a letter, setting forth
several options, including having a discussion with Lowrey, but noting that
there was no “blue print for conduct in this regard” and advising that PPOA’s
board members should “exercise their independent judgment.” 

          Lynda
emailed the letter from PPOA’s attorney to PPOA’s board members.  Her email asked
whether the matter with Lowrey had been adequately addressed and questioned whether
further review was needed.  Lynda asked PPOA’s board members to respond and
indicated action would be taken in accordance with the majority of votes.  McComas
responded to Lynda’s email.  McComas expressed his opinion that the settlement
was not fair, that a potential conflict of interest existed, and that he wanted
additional investigation into the matter.  Other PPOA board members responded
that they felt that the matter had been adequately addressed. 

          During
the fall of 2009, PPOA board members expressed concerns about Lynda’s leadership
of PPOA.  Appellees called for a special meeting of PPOA’s board of directors
on October 5, 2009, and the meeting was open to the public. The special meeting
was also recorded for replay on the local community television station. 

          At
the special meeting, McComas stated that a group of directors had asked Lynda
to step down as PPOA’s president and made a made a motion that she resign from
the presidency but not from the board.  The motion was seconded.  Lynda
repeated the motion and called for discussion.  One board member voiced his
support for Lynda, even after acknowledging that she had made mistakes; another
board member claimed that he had been excluded from conversations about requesting
Lynda’s resignation.  Lynda asked if there was any further discussion before a
vote was called, and McComas said that he had prepared a statement.  McComas then
read his statement out loud.  The complained-of portions of McComas’s statement,
as transcribed by PPOA, are set forth in italics below:

The Road Impact Fee
lawsuit was negotiated during a part of this administration.  And her . . .  at
this time, in the very last days of that administration’s term.  Within the
term of that administration, a key negotiator went to work for the Anthony
Group.  Madam President was made aware of the potential conflict of interest. 
And I underlined potential conflict of interest, just potential.  And refused
to allow an investigation into this potential conflict, ignoring requests to
consider alternate legal advice and ignoring requests to stop the Judge[’]s
signature that would make the gentleman everything but being ????instrickible.
[sic] This ill minded[[2]] rejection of
all the requests not only cost PPOA serious money, thousands and possibly
millions of dollars, but it eliminates our ability to limit Anthony Groups’
truck weight limits unless they are specifically working a on [sic]
single family dwelling.  So when they are building the runway out there,
they can drive anything they want to over our roads, as long as there is no
immediate physical damage.  Madam President’s actions were in description[:]
unethical, unprofessional, and in direct conflict of interest of the best
interest of our membership.  The policy in this membership/Association is
that it will be the policy of PPOA to maintain the highest ethical and legal
standards in conduct of its business.  To be scrupulously honest and straight
forward in all of its dealings, and to avoid situations where there might, just
might give . . . either the appearance of unethical or illegal behavior.  We
didn’t even investigate it, in fact the way it was settled was okay, I want you
board members to read the settlement, there will be no further discussion, you
come back and you tell me whether you like this settlement or not, but that’s
where it’s going. [Emphasis added to show portions complained of.]

 

          After
McComas read his statement and other PPOA board members made statements, Lynda
called for a vote on the motion.  No one voted in favor of the motion, and the
meeting was adjourned.  A month later, PPOA’s board reconvened.  Another motion
to remove Lynda as president was made and seconded; this time, the motion passed
by a vote of five to three. 

          The
Tomlinsons subsequently filed a defamation suit against Appellees based on the statement
that McComas had read at the October 5, 2009 meeting.  The Tomlinsons alleged
that McComas was the spokesperson for Appellees, and that as their spokesperson
he published 

the knowingly false
statements that Lynda’s “ill-minded rejection” of all requests made to her
concerning a negotiated settlement of a lawsuit by the board of PPOA of which
Lynda was only one of nine members who voted with six other members to two to
accept the settlement, “not only caused PPOA serious money, thousands and
possibly millions of dollars,” but it eliminated the board’s “ability to limit
Anthony Groups’ weight limits unless they are specifically working a (sic) on
single family dwelling” and her “actions were . . . unethical . . . and in
direct conflict of interest of [. . .] our membership.” 

 

The
Tomlinsons contend that the above statements are defamatory because “they have
injured Lynda’s reputation, exposing her to public hatred, contempt and
ridicule impeaching her honesty, integrity and reputation.”  The Tomlinsons pleaded
that the statements were made with actual malice; that Lynda was damaged by the
defamatory statements because “she has been caused mental anguish requiring
professional treatment”; and that as a result of the mental anguish, her
husband had suffered loss of consortium.

          Appellees
filed a traditional motion for summary judgment, and the Tomlinsons filed a
traditional motion for partial summary judgment.  The trial court held a
hearing on the competing summary judgment motions and signed a final
take-nothing judgment in favor of Appellees.  The trial court did not specify the
grounds on which it granted Appellees’ motion for summary judgment.  The
Tomlinsons perfected this appeal.

III. 
Summary Judgment
for Appellees and
Against

the
Tomlinsons Was
Proper

 

          In
their sole issue, the Tomlinsons argue that the trial court erred by granting
Appellees’ motion for summary judgment and by denying the Tomlinsons’ motion
for partial summary judgment.  The Tomlinsons contend that two specific
statements by McComas are defamatory:  his statement that Lynda’s “ill-minded”
or “single-minded” rejection of requests for investigation into the potential
conflict of interest between PPOA and former president Lowrey concerning the
settlement agreement had “cost PPOA serious money, thousands and possibly
millions of dollars” and his statement that Lynda’s actions were “unethical[,]
. . . and in direct conflict of interest of the best interest of our
membership.”

A. 
Summary Judgment Standard of Review in Defamation Suit

          We
review a summary judgment de novo.  Travelers Ins. Co. v. Joachim, 315
S.W.3d 860, 862 (Tex. 2010).  A defendant who conclusively negates, as a matter
of law, at least one essential element of a cause of action is entitled to
summary judgment on that claim.  Frost Nat’l Bank v. Fernandez, 315
S.W.3d 494, 508 (Tex. 2010), cert. denied, 131 S. Ct. 1017 (2011); Brewer
v. Capital Cities/ABC, Inc., 986 S.W.2d 636, 643 (Tex. App.––Fort Worth
1999, no pet.); see Tex. R. Civ. P. 166a(b), (c).  Thus, to be entitled
to summary judgment, a defendant in a defamation suit has the negative burden
to prove the absence of one of the essential elements of defamation, e.g., that
the statement complained of was not defamatory.  Ramos v. Henry C. Beck Co.,
711 S.W.2d 331, 333–34 (Tex. App.—Dallas 1986, no writ).

B. 
The General Law Concerning Defamation

          “Defamation”
is generally defined as the invasion of a person’s interest in his or her
reputation and good name.  Prosser & Keeton on Torts § 111, at 771 (5th ed.
1984 & Supp. 1988).  “Defamation” encompasses both libel and slander.  By
statute, Texas law defines “libel” as a defamation expressed in written or
other graphic form that tends to injure a living person’s reputation and
thereby expose the person to public hatred, contempt, ridicule, or financial
injury or to impeach any person’s honesty, integrity, virtue, or reputation or
to publish the natural defects of anyone and thereby expose the person to
public hatred, ridicule, or financial injury.  Tex. Civ. Prac. & Rem. Code
Ann. § 73.001 (West 2011).  Although “slander” is not statutorily defined, at
common law, slander is a defamatory statement that is orally communicated or
published to a third party without legal excuse.  Randall’s Food Mkts, Inc.
v. Johnson, 891 S.W.2d 640, 646 (Tex. 1995).

          To
prevail on a defamation cause of action, the plaintiff must prove that the
defendant (1) published a statement, (2) that was defamatory concerning the
plaintiff, (3) while acting with actual malice regarding the truth of the
statement where the plaintiff was a limited purpose public figure.  See
WFAA-TV, Inc. v. McLemore, 978 S.W.2d 568, 571 (Tex. 1998), cert. denied,
526 U.S. 1051 (1999); Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt.
Holdings, Inc., 219 S.W.3d 563, 574 (Tex. App.—Austin 2007, pet. denied).  In
this context, actual malice refers to the defendant’s attitude toward the truth
of what he said.  WFAA-TV, Inc., 978 S.W.2d at 573.  Actual malice means
that the defendant made the statement knowing that it was false or with
reckless disregard about whether the statement was false or not.  HBO v.
Harrison, 983 S.W.2d 31, 36 (Tex. App.—Houston [14th Dist.] 1998, no pet.).

C.  Whether a
Statement Is Capable of Defamatory Meaning

 Is a Question of Law

 

          Whether
a statement is capable of a defamatory meaning is a question of law.  See
Fort Worth Star-Telegram v. Street, 61 S.W.3d 704, 708 (Tex. App.—Fort
Worth 2001, pet. denied) (citing Musser v. Smith Protective Servs., Inc.,
723 S.W.2d 653, 655 (Tex. 1987)).  We must view the statements alleged to be
defamatory as a whole and in light of the surrounding circumstances; the
determination is based upon how a person of ordinary intelligence would
perceive the entire statement.  Ezrailson v. Rohrich, 65 S.W.3d 373, 376
(Tex. App.—Beaumont 2001, no pet.).  Statements alleged to be defamatory must
be viewed in their context; they may be false, abusive, unpleasant, or
objectionable to the plaintiff and still not be defamatory in light of the
surrounding circumstances.  Id.  We must consider the entire communication,
not mere isolated sentences or portions.  Musser, 723 S.W.2d at
655.  Purely subjective assertions or opinions that do not imply the existence
of undisclosed facts and do not misconstrue the facts are not actionable as
defamation.  Bentley v. Bunton, 94 S.W.3d 561, 583–84 (Tex. 2002); see
also Carr v. Brasher, 776 S.W.2d 567, 570 (Tex. 1989) (explaining that “[a]ll
assertions of opinion are protected by the first amendment of the United States
Constitution and article I, section 8 of the Texas Constitution”).  This is
particularly so when the facts underlying an opinion are set out in the
publication itself, thereby allowing the listener to evaluate the facts and
either accept or reject the opinion.  Brewer, 986 S.W.2d at 643.  Instead,
to be actionable as defamation, a statement must be an assertion of verifiable
fact, that is, a statement that purports to be verifiable.  Bentley, 94
S.W.3d at 583–84.

D. 
Application of the Law to the Present Facts

          McComas’s full
statement from the October 5, 2009 special meeting is as follows:[3]

Just a couple of
words of comment on some of the statements.  President Tomlinson, for whom I
have high regard, was counseled and I did . . . from the first, since the early
days of her administration, and there has not been a moment that this whole,
this entire group has tried to help her get through this.  (I don’t know what
is causing the feedback.)  And we have met and we have discussed at length the
issues that are on the table here.  I would just like you to listen with an
open mind and understand the moral and ethical dilemma that this group finds
our selves in.  Okay, please?  This movement is not directed at the employee,
if anything it is supportive of, to get away from the micro-management and let
Mr. Bartholomew run this company as he was hired to do.  At any rate, today we
are not gathered to remove a member from the board.  Members of the Association
elect the members of the board members/board of directors.  Board members then
elect, among themselves the Board member that they wish to lead them throughout
the coming year.  Each time that it is in the best interest of the Association
to replace the officers an internal board business is the subject of
consideration at a special meeting.  We are here.  The Board members requesting
this meeting do so with no personal agenda and excludes no group, with no
exceptions, particularly the PPCMA.  This action is not a coop, as somehow
rumored.  We do however need to consider today our current leadership and
search for answers which will help us arrive of what is in the best interest of
our association and its membership.  As legally elected directors of this
association, each of us took an Oath of Office to defend and fulfill the
dictates.  And all that means is those that are put upon us by the Bylaws.  It
has come to out attention that there have been continued violations of our
governing documents, that we feel are inappropriate.  We have a fiduciary duty
to both the Association and ourselves to assure the Association and its funds
are managed in an open manner, according to the governing documents we swore to
defend.  This meeting is called only after a great deal of consideration,
thought, angst, back-and-forth, trying to reconcile the differences, trying to
make things work as they should according to the Bylaws.  After numerous
unsuccessful attempts to reach an agreement following the transfer of
leadership, allowing the transfer of leadership it then became a consideration
for the Association and membership.  The last effort failed for compromise,
because it included Cissy Wilson’s resignation from the Board.  It is this
groups feeling this 15 years, Granbury City Council woman’s views is a huge
untapped Board resource.  And she was elected by the membership, in an election
where she garnered the highest vote count.  For us to ask her to resign so that
Ms. Tomlinson would step down does not seem just.  My resolve remains strong
and anyone adds less to this inescapable action from this meeting.  Under our
current leadership we are faced with an ethical dilemma to uphold the moral,
ethical, and fiduciary responsibility of this community that we are elected to
serve or we compromise our integrity.  I will not do that.  In my campaign for
the board, I stated I will serve with integrity.  Certainly not political
outcome, I am not a politician.  Therefore to resolve our ethical dilemma we
asked Mrs. Tomlinson to step down from the board presidency, for the betterment
of our community and allow the Board to elect a new President.  Who I hope will
be Board Member, Jim Miller.  Some of the issues that have plagued us, and
still haunt us are:

 

In working with the
budget, the salary ranges and employment contracts for all PPOA upper
Management have not been shared.  Repeated Board requests have been denied.  It
is unclear what these salaries are.  How can we approve the proposed budget
without this information?  Where is the integrity in that? 

 

The Road Impact Fee
lawsuit was negotiated during a part of this administration.  And her . . .  at
this time, in the very last days of that administration’s term.  Within the
term of that administration, a key negotiator went to work for the Anthony
Group.  Madam President was made aware of the potential conflict of interest. 
And I underlined the potential conflict of interest, just potential.  And
refused to allow an investigation into this potential conflict, ignoring
requests to consider alternate legal advice and ignoring requests to stop the
Judges signature that would make the gentleman everything but being
????instrickible.  This ill minded rejection of all the requests not only
cost PPOA serious money, thousands and possibly millions of dollars, but it
eliminates our ability to limit Anthony Groups’ truck weight limits unless they
are specifically working a on single family dwelling.  So when they are
building the runway out there, they can drive anything they want to over our
roads, as long as there is no immediate physical damage.  Madam President’s
actions were in description; unethical, unprofessional, and in direct conflict
of interest of the best interest of our membership.  The policy in this
membership/Association is that it will be the policy of PPOA to maintain the
highest ethical and legal standards in conduct of its business.  To be
scrupulously honest and straight forward in all of its dealings, and to avoid
situations where there might, just might give the either the appearance of
unethical or illegal behavior.  We didn’t even investigate it, in fact the way
it was settled was okay, I want you board members to read the settlement, there
will be no further discussion, you come back and you tell me whether you like
this settlement or not, but that’s where it’s going. 

 

On several occasions,
Madam President violated the Communications Policy, with her articles in the
Columns potentially discrediting Pecan members and incurring PPOA legal fees to
offset potential liable lawsuits.  To read the PPOA policy, it says
Communications should strive for impartial treatment of issues and
dispassionate handling of controversial subjects.  That was certainly
controversial.  It should provide a discussion forum for the exchange of
comment and criticism.  Editorials and expressions of personal opinion should
be clearly labeled as such.  Concern for community, business or person
interests should not cause the PPOA communication to distort nor misrepresent
the facts.

 

Let’s go on to the
Anthony Group’s development with the Landings.  Director Roman advised the
Board that the Anthony Group was presenting their preliminary development plans
to the County Commissioner’s Court for approval at their regular meeting.  The
Board decided and the Board discussed this at length, to send the LENMO Chair,
then, Mr. Frank Andrews.  There was concern with the plans and drainage, and
asked the County to exercise due diligence before approving them.  Mrs.
Tomlinson interceded that evening, after the Board, but before the County hearing
and based on the advise of an Anthony Group employee and she touched again with
our legal, our law firm; advised not to do anything but wait until the
development is completed.  And if it had problems at that time, don’t accept
it, and begin legal proceedings.  Mr. Andrews did exactly that and sat in the
Commissioner’s hearing with an Anthony Group employee, thus giving/denoting
PPOA’s approval of these plans.  Subsequently the preliminary plat was accepted
by the County and approved.  Later, and again at the urging of Director Roman,
PPOA Board and certain members did become involved and has stopped the
development until appropriate plan is submitted to the County and approved by
them.  Mrs. Tomlinson’s action was in direct violation of the Board consciences
and severely jeopardized PPOA’s ability to insure the development was not harming
our existing member’s homes.

 

And to prepare for
this meeting to defend her position, Ms. Tomlinson spent PPOA legal fees in
violation of the following policy:  Budgets, Contracts, Checks, Deposits and
Funds, no Director of the Board of Directors, Committee Chairperson or
Committee member may spend or commit to spend any budgeted or unbudgeted funds
of the Corporation without the approval of the Board of Directors.  Our General
Manager, who must control this budget, was not even aware that there was interaction
between Mrs. Tomlinson and our new and better, much improved legal team.

 

Mrs. Tomlinson has
and continues to meet with the Anthony Group on long range planning and other
issues in violation of the extraordinary meetings policy in the LENMO Agreement. 
Additionally, the board has agreed that all communications with the Anthony
Group will go through the Lenmo Chair.  This has been ignored by Mrs.
Tomlinson.  It was agreed to provide continuity to communications, one voice,
the Board being communicated through the Lenmo Chair, not being restrictive,
but to have continuity.  The PPOA Policy reads that the President and one other
Director who will have been selected by the BOD in an Open Meeting and the
General manager will handle all extraordinary meetings such as those with the
Developer or any other outside entities concerning PPOA business.  This is flat
policy violation.

 

The current
interviews with PPOA Audit firm . . . Every year we choose to continue or find
a new audit firm.  During this year’s interviews with the auditing firms, it
was discovered by the audit committee that we lost $159,000, due to, of
membership monies, due to, let me find my script folks, I’m sorry, . . . due to
PPOA’s failure to comply with the state sales tax recovery requirements.  Mrs.
Tomlinson directed the board to keep this from the membership.  This directly
violates our personal ethics, PPOA’s Mission Statement, PPOA’s Policy
Statement, which I read; the officers, the board members and management of the
Corporation will set an example of the highest ethical conduct.  The
corporation expects complete candor and total honestly of all of its officers,
board members, managers, and employees to assure compliance with this policy.

 

There are a number of
things that go on every day in our board activities that we are not following
the policy.  And again, we have asked to follow the policy.  I don’t want to be
up here, I don’t want to be subject to lawsuits, I don’t want to be personally
liable, and I don’t want to be responsible to you, the members of this
Association, we want to do things right.  Some of the things that aren’t
happening correctly; the board of Directors must approve any expenditure or
funding that is not approved in the budget or knowingly exceeds the approved
budget.  And we are not doing that.  The Board of Directors must also approve
any transfer of budgeted funds between line items or between departments.  We
are not doing that.  The General Manager and his designee shall have the
authority to sign checks up to and including $1,000.  The Board must approve
all expenditures after $1,000.  And by having the President of the organization
to sign the check for that over $1000 expenditure does not give the Board of
Director’s approval, we did not approve it.  All contracts and agreements with
cumulative costs exceeding $1,000 must be approved by the Board of Directors
and signed by the President, Treasurer, or other officer of the Corporation. 
The terms and conditions of all personal contracts and agreements must be in
writing and approved by the Board of Directors.  This Board of Directors, does
not, once again seen any of these and yet we are asked by you and the Finance
Committee to approve a budget, but we don’t know what the contracts or
obligations and salaries are.  I don’t get it.  Again, how does a conscientious
director approve a budget without these items.

 

Once again, this
group of dedicated directors simply asking Mrs. Tomlinson to step down and
allow the election of a new president who can resolve these moral and ethical
dilemmas.  Allow this Board and community to begin restoring trust amongst us. 
This is probably, it is, the hardest thing, the most difficult thing I have
been involved in, in my total life.  Working on this Board, more than anything
coming to this Board meeting, this specially called board meeting, when it
could have been resolved without this action.  I thank you very much for your
ears, your consideration, as to each of the group that are trying to resolve
this moral, ethical dilemma we find ourselves in.  We have the power and votes
to depose Mrs. Tomlinson but we choose not to do that.  We ask Mrs. Tomlinson,
in good conscience, to step down.  Should she not do that, then an option is to
back away and work with the board to solve these issues.  I thank you again. [Emphasis
added to show portions complained of.]

 

          After
viewing the two specific complained-of statements in the context of McComas’s
entire statement, and considering the forum in which McComas read his statement—at
a specially-called homeowners’ association meeting to address the issue of
removal of PPOA’s president—we hold that the statements are not defamatory as a
matter of law.  As set forth above, McComas expressed his opinions regarding the
way Lynda presided over matters affecting PPOA.  He stated that her “ill-minded”
or “single-minded” rejection of requests for investigation into the potential
conflict of interest between PPOA and former president Lowrey concerning the
settlement agreement had “not only cost PPOA serious money, thousands and
possibly millions of dollars, but it eliminates our ability to limit Anthony
Groups’ truck weight limits unless they are specifically working a on [sic]
single family dwelling.”  He stated that, “Madam President’s actions were in
description[:]  unethical, unprofessional, and in direct conflict of interest
of the best interest of our membership” and noted that “[t]he policy in this
membership/Association is that it will be the policy of PPOA to maintain the
highest ethical and legal standards in conduct of its business” and “[t]o avoid
situations where there might, just might give the either the appearance of
unethical or illegal behavior.”  

The
two statements by McComas that the Tomlinsons allege are defamatory simply
express McComas’s opinions––neither statement constitutes the assertion of a
verifiable fact or purports to be verifiable––and opinions are not actionable
for defamation.  See id.; Vice v. Kasprzak, 318 S.W.3d 1, 22
(Tex. App.—Houston [1st Dist.] 2009, pet. denied) (holding statement that
plaintiff, who acted as president of board of directors for homeowners’
association and attorney of record for subdivision developer in actions against
association members for delinquent maintenance fees, had engaged in “unethical
business” was an opinion and was not actionable as defamatory statement); Brewer,
986 S.W.2d at 643 (holding that statements in “20/20” news report program that
plaintiffs––nursing home owners––were responsible for patient abuse and had
engaged in “profiteering” were, based on context and viewed in light of
entirety of report, opinions that would not support defamation action); Falk
& Mayfield, L.L.P. v. Molzan, 974 S.W.2d 821, 824 (Tex. App.––Houston
[14th Dist.] 1998, pet. denied) (holding statement accusing plaintiff of
“lawsuit abuse” was an opinion and was not actionable as defamatory statement);
see also Double Diamond, Inc. v. Van Tyne, 109 S.W.3d 848, 854–56
(Tex. App.—Dallas 2003, no pet.) (holding statements in flyer and letter
distributed to homeowners criticizing homeowner’s association’s management of
subdivision were not capable of defamatory meaning); Hadlock v. Tex.
Christian Univ., No. 02-07-00290-CV, 2009 WL 485669, at *3–5 (Tex.
App.––Fort Worth 2009, pet. denied) (holding statements made in faculty meeting—the
crux of which were that plaintiff professor had acted unethically and
unprofessionally and was guilty of misconduct—were opinions that were not
actionable as defamation).

Moreover,
the two opinions expressed by McComas are set out in the lengthy statement that
he read at the PPOA meeting, and that statement sets forth the factual basis
for McComas’s opinions.  See Brewer, 986 S.W.2d at 643.  A listener
hearing McComas’s statement and the two complained-of opinions contained in the
statement would be able to hear and to evaluate the facts on which McComas
based his opinions and either accept or reject the opinions.  See id. 
Based on the facts given in McComas’s statement, the persons hearing it or
reading it could easily decide for themselves the validity of McComas’s
opinions concerning Lynda’s alleged conduct and its impact.  See id.

          Because—when
viewed as a person of ordinary intelligence would perceive the entire
statement—the two opinions expressed by McComas and complained of by the
Tomlinsons are not actionable as defamatory statements as a matter of law, Appellees
conclusively negated an essential element of the Tomlinsons’ defamation claim. 
Accordingly, we hold that the trial court did not err by granting Appellees’
motion for summary judgment or by denying the Tomlinsons’ motion for partial
summary judgment.[4]  See, e.g., Double
Diamond, Inc., 109 S.W.3d at 854–55 (holding summary judgment for defendant
proper because the complained-of statements were not defamatory as a matter of
law); Marx v. Elec. Data Sys. Corp., No. 07-08-00022-CV, 2009 WL
1875505, at *9 (Tex. App.—Amarillo June 30, 2009, no pet.) (holding summary
judgment for defendant on plaintiff’s slander claim proper because statements,
such as “yeah, you know, the sneaky snake is here,” were not defamatory as a
matter of law).

We overrule
the Tomlinsons’ sole issue.

IV.  Conclusion

          Having
overruled the Tomlinsons’ sole issue, we affirm the trial court’s judgment.

 

SUE WALKER
JUSTICE

 

PANEL: 
DAUPHINOT,
WALKER, and MEIER, JJ.

 

DELIVERED:  November 17,
2011









[1]See Tex. R. App. P. 47.4.





[2]Appellees argue that the
phrase used by McComas at the meeting was “single minded,” and this is the
phrase the Tomlinsons used in their original petition.  The Tomlinsons changed
the phrase to “ill minded” in their amended petition, and PPOA’s transcription
of the meeting uses the term “ill-minded.”





[3]We note that the statement
contains grammatical errors and sentences that do not make sense; however, we
set forth McComas’s statement exactly as it appears in PPOA’s unofficial
transcription of the special meeting that is in the record before us.





[4]The Tomlinsons do not
point to any defamatory statements made by Wilson, Jensen, Roman, and Robinius;
therefore, summary judgment is proper for them as well.  To the extent that the
Tomlinsons rely on McComas’s opinions as being on behalf of the board and as
extending to the remaining Appellees, we have held that such opinions are not
actionable as defamatory statements as a matter of law and therefore cannot be
grounds for holding the remaining Appellees liable.